[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1347 
Utah Foam Products, Inc. (hereinafter "Utah Foam") appeals from a judgment entered on a jury verdict assessing damages in favor of Polytec, Inc., and Phil Cashion in the amount of $30,731 on their claims of unjust enrichment, and a total of $375,000 on their claims of tortious interference with a business relationship and misrepresentation. We affirm as to the award based on the claims of tortious interference with a business relationship and misrepresentation; but as to the claim of unjust enrichment we reverse the award and render a judgment for the defendants.
This is the fourth appeal to this Court in this case. The factual and procedural background of this case is well set out in this Court's prior opinions, Polytec, Inc. v. Utah FoamProducts, Inc., 439 So.2d 683 (Ala. 1983), Polytec, Inc. v. UtahFoam Products, Inc., 477 So.2d 295 (Ala. 1985), and Polytec,Inc. v. Utah Foam Products, Inc., 540 So.2d 700 (Ala. 1989), and need not be repeated entirely here. The record in *Page 1348 
the present appeal reveals the following facts relevant to this appeal:
Several buildings located at the Brookley Industrial Complex, owned by the City of Mobile and leased to Teledyne, were damaged by Hurricane Frederic in September 1979. Teledyne elected to assume full responsibility for the repair of the damaged buildings. These repairs included substantial roofing work. Teledyne hired J.O. Lockridge General Contractors (hereinafter "Lockridge") as construction manager to oversee the repair project. Part of Lockridge's work entailed the preparation of scope of work projections for the development of bids and estimates for the cost of the repairs to Teledyne's buildings. Lockridge would present proposals and receive bids for the various repair projects and submit the bids to Teledyne for approval. Teledyne would then make the final decision on any given project.
In October 1979, Phil Cashion formed Polytec, Inc., in which he and his wife were shareholders. Cashion was interested in installing roofs consisting of urethane foam covered with Miracote. Cashion began to communicate with Utah Foam concerning the material it manufactured that was used to make urethane foam. In February 1980, Polytec ordered equipment and materials from Utah Foam. These materials were delivered to Polytec in Birmingham, and from March 23 through March 25, 1980, Gerald Chadbourne, a representative of Utah Foam, stayed in Birmingham in order to train Cashion and other Polytec employees in the method of applying urethane foam to roofs. At the same time, Taylor, a sales representative for Polytec, contacted Michael Guarino, the chief architect for the City of Mobile, in an effort to sell Miracote as a floor and wall covering for use by the city. As a result of this contact, Guarino requested that Polytec give a presentation to his staff concerning Miracote. The presentation took place on March 19, 1980. Lockridge, along with several Teledyne representatives, also attended this presentation. After the presentation, a Teledyne representative, John Binford, inquired into the use of foam for a roofing system and asked Polytech to provide some additional information. Teledyne had previous experience with foam roofing systems, one having been installed at its Muskegon, Michigan, plant.
Taylor later met with Binford and submitted a proposal on behalf of Polytec to install a foam roof on one of Teledyne's buildings. In order to provide Teledyne with more information on the use of foam roofing systems, specifically roofs where foam and Miracote had been installed, Taylor made arrangements for Binford to examine the Western Iron Works plant in Birmingham, where Polytec was installing such a roof. Around April 1, 1980, Binford and Taylor flew to Birmingham to examine the roofing system being installed by Polytec. Binford was also referred to Tim Kearns. Binford visited Mr. Kearns in Oklahoma, where Binford was shown some sidewall applications of Miracote. After returning from Oklahoma, Binford asked Taylor to prepare a proposal on one of the Teledyne buildings.
Binford later inquired of Taylor as to whether there was anyone who could assist Polytec in the Teledyne project, since there was apparently some concern on the part of Binford as to Polytec's application expertise and equipment. Binford also requested that Polytec submit a qualification summary, which was required by Teledyne of all prospective vendors. The summary consisted of résumés of the firm's principals, the length of the company's existence, financial data, bonding capabilities, insurance, and other like information necessary to evaluate the stability and ability of the company to handle the job. Apparently, Polytec never submitted this qualification summary. Binford also asked Taylor to get an expert on foam roofing systems to make a presentation to Teledyne. Taylor contacted Gerald Chadbourne, a representative of Utah Foam.
A meeting was held at Teledyne's offices on April 21, 1980. In attendance were a number of Teledyne representatives, including the vice president, Gene Engler; Binford; and Lockridge. During the meeting it was revealed that Utah Foam had not applied the Miracote as a coating of the *Page 1349 
urethane foam and that the warranty on the Miracote was not the same when diathon was applied as the coating over the urethane. Polytec distributed only Miracote; it did not distribute diathon. Cashion made known Polytec's intention to submit a bid to repair the Teledyne roofs using the urethane/Miracote system, which was later submitted.
Teledyne claims that after this meeting it had doubts about the urethane/Miracote system's ability to handle building stress and to alleviate water problems. Teledyne says that it considered turning to more conventional, "built-up" roofing systems unless some other system could be found that would handle the problems of stress and water. After the meeting, Engler asked Binford to have Chadbourne return alone the next day to meet and discuss alternatives available to Teledyne using the urethane foam with some other coating.
After the meeting, Chadbourne contacted Bruce Wilson, the vice president of Utah Foam, and informed him that it appeared that Teledyne was going to install a conventional, built-up roof, but that there was still "a ray of hope" that it would use the foam with diathon, a rubber coating sold by Utah Foam.
Prior to the meeting scheduled between Chadbourne and Teledyne, Chadbourne met with representatives from Polytec to discuss Polytec's proposed contract for the repair of one of Teledyne's roofs. The meeting with Chadbourne and the Teledyne representatives took place on April 22, 1980. Teledyne asked Chadbourne if he could supply a foam roofing system that would meet Teledyne's needs. He proposed, subject to approval by Utah Foam, applying urethane foam and diathon, as well as training Teledyne people to apply it. Chadbourne was eventually hired by Lockridge at $200 per day to train applicators of the foam and diathon, which was purchased by Teledyne through Lockridge. The applicators hired by Teledyne were paid, at Teledyne's request, through Lockridge's account, for which Lockridge was fully reimbursed.
Sometime in August or September 1980, Teledyne and Lockridge discontinued their practice of employing Chadbourne to train the applicators and paying the applicators through Lockridge's account and contracted with Monolithic Engineering to handle the job. Monolithic was owned by Chadbourne, whose relationship with Utah Foam had ended in September 1980.
After the roofing work had begun, Guarino inspected the work. Following his inspection sometime in June 1980, he invited Binford and John O. Lockridge, Jr., to his home. Sometime in July 1980, Chadbourne applied a urethane roof to Guarino's residence. The bill for that roof, totalling $1,460, was paid by Guarino 9 months later. This was 16 days after a third-party action had been filed against him in this litigation.
Utah Foam originally sued Polytec and Phil Cashion on Polytec's account due for the purchase of equipment and materials used in Polytec's roofing job in Birmingham. Polytec filed a permissive counterclaim, adding counterdefendants, alleging that Utah Foam, along with others, had wrongfully deprived Polytec of business. A summary judgment was entered in favor of Utah Foam on its suit against Polytec for accounts due and the court granted Utah Foam's motion to dismiss Polytech and Cashion's counterclaim. Polytec filed an amended counterclaim, of which the trial court dismissed two counts. Polytec's appeal from that dismissal was addressed in the first appeal to this Court. Polytec, Inc. v. Utah Foam Products, Inc., 439 So.2d 683
(Ala. 1983). Upon remand, the trial court entered a summary judgment in favor of various counterdefendants on various claims. That judgment was reversed by this Court in Polytec,Inc. v. Utah Foam Products, Inc., 477 So.2d 295 (Ala. 1985).
The amended counterclaim named Utah Foam, J.O. Lockridge General Contractors, Binford, and Guarino as defendants. Polytec's amended complaint contained three counts, numbered 3 through 5. Count 3 was against Utah Foam only and alleged that Utah Foam had been unjustly enriched *Page 1350 
based on the efforts of Cashion and Polytec to secure the contract for the roofing job with Teledyne. Count 4 alleged that all named defendants, acting in concert, had interfered with Polytec and Cashion's roofing business. Count 5 alleged that all named defendants, acting in concert, had misrepresented to Polytec and Cashion that if they presented information on urethane foam roofs to Teledyne, and Teledyne decided to reroof its buildings with urethane roofs, then Polytec would be awarded the contract. After lengthy and complex procedural battles, rulings on which were appealed to this Court, as noted hereinabove, the case proceeded to trial.
The jury returned a verdict in favor of Polytec and Cashion against Utah Foam on their claim of unjust enrichment and assessed damages in the amount of $30,731. The jury returned a verdict in favor of Binford and Guarino, but against Utah Foam and Lockridge, on Cashion and Polytec's counts alleging interference with a business relationship and misrepresentation. The jury assessed damages against Utah Foam and Lockridge under both counts at a total of $375,000. It is from the judgment entered by the trial court on the jury verdict that Utah Foam now appeals.
Utah Foam raises the following issues on this appeal: (1) Whether the plaintiffs, in order to recover on a claim of unjust enrichment, must prove that work performed by them was done with an expectation that whoever benefited thereby would compensate them for their efforts and, further, that any benefit conferred as a result of their labor was not merely incidental; (2) whether a claimant seeking to recover under a quasi-contract theory must prove the reasonable value of its services; (3) whether the contract that Polytec says it was prevented from getting would have been illegal had it been obtained and, if so, whether interference with an illegal contract can serve as the basis for a tortious interference claim; (4) whether a cause of action for tortious interference with a business relationship can be maintained absent proof that the complainant would have received a contract but for the alleged wrongful interference by a competitor; (5) whether an action for fraud will lie when it affirmatively appears that no fact was verbally misrepresented to the plaintiff; and (6) whether a shareholder or employee of a corporation has an individual cause of action for torts committed against, or for moneys allegedly due, that corporation. In the interest of clarity, we have in our discussion consolidated several of the issues raised by Utah Foam.
Utah Foam first argues that in order for Polytec's claim of unjust enrichment to succeed, Polytec must prove that its efforts were undertaken with an expectation that whoever benefited thereby would compensate it for its efforts and also that any benefit conferred as a result of those efforts was not merely incidental. Utah Foam maintains that Polytec did not prove that it undertook the efforts to secure the contract with Teledyne with an expectation that it would be compensated for those efforts alone, and did not prove that any benefit it may have conferred was not incidental. We agree.
It is well settled in Alabama that in order to succeed on a claim of unjust enrichment, the plaintiff must show that it had a reasonable expectation that there would be compensation for the services. Burgess Min. Const. Corp. v. Lees,440 So.2d 321 (Ala. 1983). Furthermore, this Court has stated that the law implies a promise to pay for services rendered when they are knowingly accepted and there is an expectation of payment for those services. It is equally well established that there can be no recovery for services gratuitously rendered and where there is no expectation of payment. Opelika ProductionCredit Ass'n, Inc. v. Lamb, 361 So.2d 95 (Ala. 1978); Jacks v.Sullinger, 284 Ala. 223, 224 So.2d 583 (1969).
Cashion and Polytec, along with other contractors, were attempting to secure a contract for the reroofing of Teledyne's buildings. They were seeking a benefit to themselves with the contract to repair the roofs. An examination of the record indicates to this Court that there was no evidence *Page 1351 
that Cashion or Polytec expected to be compensated for their efforts in attempting to secure the contract with Teledyne, if someone else got the contract. What Cashion and Polytec did expect was that they would be awarded the contract. Furthermore, any benefit conferred upon Utah Foam was purely incidental.
With respect to the amount of the damages awarded to Polytec and Cashion by the jury, no such restitutionary award may be had unless there has been some unjust enrichment, because the remedy of restitution is designed to remedy the detrimental effects caused by unjust enrichment. As we have stated above, because there is no evidence upon which the jury could have found unjust enrichment, there can be no restitutionary recovery by Polytec and Cashion. Furthermore, in order to recover, it is incumbent upon the plaintiff, not only to establish the existence of the unjust enrichment, but to establish also the reasonable value of the services rendered.
In the present case, the record reveals that Polytec and Cashion offered no proof as to the reasonable value of the services allegedly rendered. Polytec's argument that Utah Foam's receipt of $726,069.18 from Teledyne constituted sufficient evidence for the jury to find that Utah Foam was unjustly enriched in the amount of $30,731, is incorrect. The jury's award of damages may not rest on the pure speculation that because Utah Foam received $726,069.18 from Teledyne that Utah Foam must have been unjustly enriched by $30,731, when there was no evidence presented as to the value of Polytec and Cashion's services. Therefore, because there was no evidence presented to show that Polytec and Cashion expected to be paid for their efforts in attempting to get the roofing contract, even if someone else received the contract, and because there was no evidence as to the reasonable value of their services, the jury verdict awarding damages on this claim is unsupported and cannot stand.
The next argument advanced by Utah Foam deals with Cashion and Polytec's allegations of misrepresentation. Utah Foam argues that there can be no recovery for misrepresentation where there was no evidence indicating that a material fact was misrepresented. After carefully examining the record, we conclude that while there was no evidence that Lockridge or Utah Foam verbally misrepresented, or for that matter made any verbal representation of, any facts as to the award of the contract, there was sufficient evidence that Lockridge and Utah Foam's conduct constituted a representation that they, in concert, would do nothing to prevent Polytec from being awarded the contract if a foam roof were to be used by Teledyne.
We cannot limit our inquiry into misrepresentation, as Utah Foam would have us do, to a single fact or statement. Misrepresentation may take many forms, a verbal misrepresentation being just one form. The statements and conduct of the parties must be viewed in their entirety to adequately resolve the question of whether a misrepresentation has occurred. See Sharp Electronics Corp. v.Shaw, 524 So.2d 586 (Ala. 1987).
Polytec and Cashion argue that the conduct of the defendants induced them to act to their detriment in putting forth substantial effort and time in formulating data on foam roofing systems, knowing full well that they intended to prevent Polytec from being awarded the contract. Considering all of the evidence presented and viewing the statements and the conduct of the parties as a whole, we agree that the evidence presented was such that a jury could reasonably find that Utah Foam and Lockridge led Polytec to believe that they would do nothing to prevent its obtaining a contract with Teledyne.
The evidence, considered as a whole, tended to show that Lockridge exhibited a great degree of interest in Polytec's foam roofing system. Lockridge was so interested that he flew to Birmingham to view Polytec's work in progress and later flew to Oklahoma to observe other applications of Miracote. Lockridge, along with representatives of Teledyne, also requested that several presentations be given by Polytec *Page 1352 
on its roofing system, and requested that an expert on foam roofs be present at one such presentation. This evidence tends to show that Polytec reasonably believed that if Teledyne decided to use a foam roofing system it would be awarded the contract. Moreover, the evidence suggests that Lockridge's conduct induced Polytec to put an abnormally high amount of effort into its attempt to secure the contract.
The evidence showed further that Utah Foam, by its conduct, misrepresented to Polytec that it would assist Polytec in securing the contract, while secretly attempting to get the job itself through a combination of activities designed to discredit Polytec and ensure itself of getting the job. Utah Foam met with Polytec representatives on several occasions in order to plan how best to get the contract for Polytec. A jury could conclude that Utah Foam would then privately meet with Teledyne and Lockridge and engage in tactics designed to distance Teledyne and Lockridge from Polytec and present proposals for Utah Foam to do the work. From the facts presented at trial, a jury could decide that Utah Foam maintained an image of helpfulness toward Polytec, while doing behind its back whatever was necessary to prevent Polytec's success and to secure the contract itself.
We conclude, therefore, that, while there was no evidence of a verbal misrepresentation, the evidence, viewed as a whole, was sufficient to allow the jury to find that Lockridge and Utah Foam, through their conduct, misrepresented to Polytec that they would do nothing to prevent Polytec from obtaining the contract with Teledyne. The evidence in this regard is circumstantial, but the evidence of fraud in many cases is circumstantial.
With respect to Polytec and Cashion's claims of tortious interference with a business relationship, Utah Foam argues that there can be no recovery where, in order to prove the claim, the plaintiff must rely on what would be an illegal contract. Utah Foam argues that because the aggregate value of the contract in question would involve more than $20,000, under Ala. Code 1975, § 34-8-1, Polytec is required to have a general contractor's license. Because Polytec had no such license, Utah Foam argues, any contract it entered into with Teledyne for the repair of the roof would have been illegal. Ala. Code 1975, § 34-8-6.
Although it may be true that Polytec did not have a general contractor's license while soliciting the contract with Teledyne, this fact alone does not defeat its claim of tortious interference with a business relationship. Polytec was not awarded the contract with Teledyne, and we cannot say that if the contract had been awarded to Polytec that it would not have complied with § 34-8-1 by securing the required license.
The cases cited by Utah Foam on this point are all distinguishable. In each case a contract had been formed, and one party had failed to comply with Alabama law, thereby rendering the contract illegal. The noncomplying party then sought to enforce the contract, or to sue thereon. In those cases, the suit was barred because the contract was deemed illegal. In the present case, however, no contract had been formed and this Court cannot say that the contract would have been illegal, because Polytec could have complied with applicable Alabama law.
Utah Foam argues further that there can be no recovery for tortious interference with a business relationship unless the plaintiff proves that he was damaged by the interference. Specifically, Utah Foam argues that in order to prove damage, Polytec must prove that, but for the alleged interference by Utah Foam, it would have been awarded the contract with Teledyne. We conclude, however, that Utah Foam is incorrect in its argument that Polytec was not harmed by Utah Foam's interference, and that it has also misstated the burden placed on a plaintiff attempting to establish a claim of tortious interference with a business relationship.
A prima facie case of interference with a business relationship requires proof of the following elements: (1) The existence of a contract or business relation; *Page 1353 
(2) the defendant's knowledge of the contract or business relation; (3) intentional interference by the defendant with the contract or business relation; and (4) damage to the plaintiff as a result of the defendant's interference. As an affirmative defense, the defendant may prove that it was justified in the interference. Lowder Realty, Inc. v. Odom,495 So.2d 23 (Ala. 1986). In the present case, we conclude that Polytec and Cashion proved each of the required elements and made out their case of interference with a business relationship. Furthermore, there was no evidence that Utah Foam was justified in interfering with that business relationship.
Utah Foam argues that the plaintiffs, in order to prove damages on their claim of interference with a business relationship, must establish that "but for" the interference they would have been awarded the contract. At the outset, we point out that this argument is wholly unsupported and is incorrect. Such a burden of proof would be too harsh on the plaintiff. The tort of interference with a business relationship is designed to protect property interests in businesses and to compensate for the damage caused by that interference. It is the right to do business in a fair setting that is protected. Sparks v. McCrary, 156 Ala. 382,47 So. 332 (1908). See also Gross v. Lowder Realty Better Homes Gardens, 494 So.2d 590 (Ala. 1986). Placing a "but for" burden on Polytec essentially would nullify and render useless the action for interference with a business relationship and destroy the protection it was designed to provide. Utah Foam, in essence, argues that the only damage from interference with a business relationship is the failure to be awarded the contract. This, however, is a far too narrow approach. Proof that a company would have been awarded a particular contract is not the sine qua non of the tort of interference with a contract or a business relationship. The tort has two aspects. The damage resulting from interference can occur regardless of the fact that the company would not have been awarded the contract, and it can also take other forms.
In the present case, a jury could conclude that, while outwardly operating in a role of assisting Polytec in making its presentations in an attempt to secure the contract with Teledyne, Utah Foam actually engaged in tactics behind Polytec's back to prevent Polytec from getting the contract, in order to secure the contract for itself. Utah Foam attended the meeting with Teledyne at the request of Polytec in order to assist in the marketing of Polytec's products and services. The evidence tends to show that Utah Foam, once in these meetings, attempted, and was eventually successful in its efforts, to discredit Polytec's products and services and to bolster its own. Utah Foam continually gave the outward appearance of playing a role of assistance toward Polytec, but the jury could conclude that Utah Foam at every opportunity sought to turn Teledyne away from Polytec and to secure the job for itself. Furthermore, Utah Foam's representative, Chadbourne, made the proposal to train Teledyne's applicators and to supply material and equipment, when neither Utah Foam, Teledyne, nor Lockridge was engaged in the roofing business. Last, shortly after inspection of Lockridge's work on Teledyne's roof and approval by the City of Mobile's chief architect, Guarino, Chadbourne applied a foam roof to Guarino's personal residence.
Regardless of the fact that Teledyne maintains that it would not have awarded the contract to Polytec, Utah Foam's conduct thwarted Polytec's ability to adequately present its products and services and virtually eliminated any remaining possibility that Polytec could have been awarded the contract. Thus, we conclude that the plaintiffs presented sufficient evidence for the jury to find that Utah Foam tortiously interfered with Polytec's business relationship and that Polytec was damaged as a result of that interference.
Utah Foam's final argument is that a shareholder or an employee of a corporation has no individual cause of action for torts committed against the corporation, a distinct legal entity, or for work performed by that corporation through its *Page 1354 
agents. Utah Foam argues that Cashion's claims against Utah Foam and the other defendants are totally derivative and may not properly be asserted by an individual, but must be asserted only by the corporation. We conclude, however, that this is not the case.
This issue was decided on the first appeal to this Court inPolytec, Inc. v. Utah Foam Products, Inc., 439 So.2d 683
(Ala. 1983). In reversing the trial court's dismissal of the action for failure to state a claim upon which relief could be granted, this Court thereby held that Cashion had stated a claim upon which relief could be granted. Therefore, Cashion does have standing to sue in this case.
For the reasons stated in this opinion, the judgment is reversed insofar as it awarded damages to Polytec and Cashion on their claim of unjust enrichment; it is affirmed insofar as it awarded damages to Polytec and Cashion on their claims of misrepresentation and tortious interference with a business relationship; and a judgment is rendered for the defendants on the claim of unjust enrichment.
AFFIRMED IN PART; REVERSED IN PART; AND JUDGMENT RENDERED.
HORNSBY, C.J., and ALMON, STEAGALL and INGRAM, JJ., concur.