The CIT Group/Equipment Financing, Inc. ("CIT"), appeals from a judgment entered against it and in favor of George Roberts and Good Hope Wrecker Service, Inc. ("Good Hope"), by the Cullman Circuit Court for unpaid storage fees concerning certain vehicles. We reverse and remand.
This case was submitted to the circuit court on stipulated facts together with briefs and affidavits submitted by the parties. Thus, unless otherwise noted, the following facts have been stipulated by the parties.
B.R. Armstrong, Inc. ("the debtor"), a company operated by its namesake, became indebted to CIT pursuant to three conditional sales agreements providing security interests in several pieces of equipment. Pursuant to a conditional sales agreement dated October 15, 1997, the debtor granted Liberty Truck Sales, Inc. ("Liberty"), a first priority security interest in a freightliner tractor ("the tractor"). Liberty subsequently assigned its rights *Page 187 
and interest in the October 15, 1997, conditional sales agreement to Newcourt Financial USA, Inc. ("Newcourt"). Newcourt perfected its security interest in the tractor by applying for and obtaining a certificate of title to it from the State of Alabama.
Pursuant to a conditional sales agreement dated October 16, 1997, the debtor granted Freightliner Trucks of Dothan, Inc. ("Freightliner Trucks"), a first priority security interest in two 1995 Hyundai dry van trailers ("Trailer 904" and "Trailer 906"). Freightliner Trucks assigned its rights and interest to the October 16, 1997, conditional sales agreement to Newcourt. Newcourt perfected its security interest in Trailer 904 and Trailer 906 by applying for and receiving certificates of title to them from the State of Alabama.
Pursuant to a conditional sales agreement dated November 7, 1997, the debtor granted Freightliner Trucks a first priority security interest in three more Hyundai dry van trailers ("Trailer 903," "Trailer 905," and "Trailer 907") (the tractor, Trailer 903, Trailer 904, Trailer 905, Trailer 906, and Trailer 907 are hereinafter collectively referred to as "the equipment"). Freightliner Trucks assigned its rights and interest to the November 7, 1997, conditional sales agreement to Newcourt. Newcourt perfected its security interest in Trailer 903, Trailer 905, and Trailer 907 by applying for and receiving certificates of title to them from the State of Alabama.
Newcourt perfected its security interests in the equipment before the debtor placed the equipment with Good Hope to be stored. Newcourt's address on all the certificates of title for the equipment was 1979 Lakeside 450, Tucker, Georgia. CIT is the successor in interest to Newcourt; Newcourt's office in Tucker, Georgia, was closed after CIT took control of Newcourt.
On or about February 11, 2000, the debtor filed a petition for bankruptcy under Chapter 11, Title 11 of the United States Code,11 U.S.C. § 101 et seq. ("the bankruptcy code"), in the United States Bankruptcy Court for the Northern District of Alabama, Southern Division ("the Bankruptcy Court"). Good Hope was not a party to the debtor's bankruptcy and was not listed as a creditor in the petition. After commencement of the debtor's bankruptcy case, the debtor remained in possession of the equipment and continued to operate its business pursuant to applicable provisions of the Bankruptcy Code. Pursuant to 11 U.S.C. § 541, the filing of the debtor's bankruptcy petition created a bankruptcy estate comprised of all legal or equitable interests in the debtor's property, and under 11 U.S.C. § 362(a), the filing of the bankruptcy petition operated as a stay against "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." The stay prohibited CIT from repossessing the equipment.
In August 2000, the debtor placed the equipment along with several other pieces of property in a storage yard owned and operated by Good Hope. Good Hope is owned and operated by George Roberts. Roberts and Good Hope claim in their brief to this court that the debtor placed the equipment and other property in storage because it was closing down its business; however, that alleged fact was not stipulated to and there is no evidence that CIT knew that the debtor was closing down its business at that time because it had continued to operate even after it filed for bankruptcy. George Roberts agreed that he would not charge storage fees for the equipment and other property until after September 1, 2000. Thereafter, he expected to be paid storage fees for the equipment and other property that remained at the storage facility. The debtor *Page 188 
intended for the respective finance companies holding liens on the equipment and other property stored with Good Hope to remove their property from Good Hope's premises. However, CIT was not notified in August 2000 that the equipment was placed on the business premises of Good Hope.
On or about December 4, 2000, the debtor's Chapter 11 bankruptcy proceeding was converted to a Chapter 7 proceeding under the Bankruptcy Code. During the fall of 2000, B.R. Armstrong was in bankruptcy court on more than one occasion; on those occasions, he informed all parties present where he had stored the equipment and other of the debtor.
On January 11, 2001, after conversion of the bankruptcy proceeding, attorneys for the debtor and CIT negotiated an agreement pertaining to a termination of the stay and a surrender of the equipment. The bankruptcy judge entered an order based on that agreement in the bankruptcy proceeding on January 16, 2001. Following the lifting of the stay, CIT discovered that the equipment was located on Good Hope's premises. CIT then demanded that Good Hope surrender the equipment. Good Hope failed or refused to surrender the equipment, citing a debt due for the towing of the equipment to and the storage of the equipment at Good Hope's storage facility.
In April 2001, Good Hope obtained a certificate of title from the State of Alabama to the tractor. The Alabama Department of Revenue sent a letter to Newcourt's Georgia address advising it of the change in title, but, as was noted above, Newcourt's Georgia office was closed when CIT assumed control of Newcourt. Roberts and Good Hope allege in their brief to this court that CIT did not provide a forwarding address in place of Newcourt's Georgia office address, but this alleged fact was not stipulated to and the record contains no evidence concerning it.
The parties agree that Roberts and Good Hope do not have a statutory or common-law lien for unpaid storage charges under Alabama law. They also agree that the debtor "told unidentified persons at some point in time during the pendency of his bankruptcy cases where certain collateral was located" but that "[t]here is no evidence that CIT was told the location of the collateral." B.R. Armstrong admitted that his first conversation with CIT concerning the location of the equipment occurred in May 2001, and CIT and Roberts did not have any conversations before May 2001 concerning the equipment. The parties also agree that CIT never explicitly agreed to pay Roberts and Good Hope any storage charges.
On May 31, 2001, CIT filed a complaint against George Roberts and Good Hope in the Cullman Circuit Court; on the same date, CIT filed a motion for writ of seizure concerning the equipment. Roberts and Good Hope answered and filed a counterclaim against CIT for recovery of the storage charges. On September 10, 2001, CIT and Roberts and Good Hope entered into an agreed order for a writ of seizure that required Roberts and Good Hope to surrender the equipment to CIT. Roberts and Good Hope reserved the right to pursue the claim for storage charges.
Roberts and Good Hope claimed storage fees for 334 days on the equipment. The rate for the tractor was $20.00 per day, and the rate for the five trailers was $15.00 per day; the total claim for the storage fees was $31,730. Affidavits were submitted from George Roberts, William Chaffin, and Donald Ponder on the reasonableness of the rates. Each is in the wrecker business and stores vehicles for the public; Chaffin and Ponder charge the same rates that Roberts and Good Hope claimed as *Page 189 
the charges for storage of the tractor and the trailers in this case. CIT submitted an affidavit from Rosemarie Chambless, a CIT vice president in charge of sales and remarketing of repossessed equipment in Alabama, who stated that a reasonable rate would be $15.00 per day for the tractor and $10.00 per day for trailers.
After the trial court denied a motion for a summary judgment filed by CIT, the parties agreed to submit the case on the stipulated facts provided above, the affidavits concerning the reasonableness of the alleged storage fees, and the parties' trial briefs. On February 4, 2003, the trial court entered a judgment in favor of Roberts and Good Hope. In its judgment, the trial court highlighted the fact that George Roberts "expected to be paid storage fees after September 1, 2000, for units left and stored at his location." It concluded that the storage fees claimed by Roberts and Good Hope were "reasonable" and that "the knowledge of B.R. Armstrong as to the location of the five trailers and one tractor at [Good Hope's] shop is imputed to CIT." Upon so concluding, the trial court awarded Roberts and Good Hope $28,230.20 in storage fees for 272 days, covering the period from September 1, 2000, to May 31, 2001, and including interest from May 31, 2001, at the statutory rate of 6 percent. CIT appeals.
 "[W]hen a trial court sits in judgment on facts that are undisputed, an appellate court will determine whether the trial court misapplied the law to those undisputed facts. Furthermore, where the trial court sits without a jury and hears evidence in the form of stipulations, briefs, and writings of the parties, then an appellate court will sit in judgment on the evidence."
Craig Constr. Co. v. Hendrix, 568 So.2d 752, 756 (Ala. 1990) (citations omitted). Thus, no presumption of correctness is afforded to the trial court's judgment.
CIT first contends that the trial court erred in finding CIT liable for the storage fees because, it argues, no express or implied contract existed between the parties and CIT had no knowledge of the location of the equipment until May 2001. Roberts and Good Hope concede that there was no express contract between the parties, but they contend that the trial court's ruling was justified on the theory of quantum meruit to prevent the unjust enrichment of CIT.
 "`Both of these theories for equitable relief [work and labor done and quantum meruit] are methods of avoiding unjust enrichment, and both require the existence of a contract, either express or implied. See United States ex rel. Eastern Gulf, Inc. v. Metzger Towing, Inc., 910 F.2d 775 (11th Cir. 1990); and G.S. Gothard Son Contractors, Inc. v. Mansel, 611 So.2d 1101 (Ala.Civ.App. 1992).
 "`"There are two kinds of implied contracts — those implied in fact and those implied in law. Contracts implied in law are more properly described as quasi or constructive contracts where the law fictitiously supplies the promise [to pay for the labor or services of another] to prevent a manifest injustice or unjust enrichment."
 "`Green v. Hospital Bldg. Auth. of the City of Bessemer, 294 Ala. 467, 470, 318 So.2d 701, 704
(1975). "The rule is that if one knowingly accepts services rendered by another, and the benefit and result thereof, the law implies a promise on the part of the one who so accepts with knowledge, to pay the reasonable value of such services rendered." Richards v. Williams, 231 Ala. 450, 453, 165 So. 820, 823 (1936). In order to succeed *Page 190 
on a claim of unjust enrichment, the plaintiff must show that he had a reasonable expectation of compensation for his services. Utah Foam Prods., Inc. v. Polytec, Inc., 584 So.2d 1345, 1350 (Ala. 1991).'"
Associates Commercial Corp. v. Roberts, 844 So.2d 1256, 1261
(Ala.Civ.App. 2002) (quoting Phillips v. Fuller, 814 So.2d 885,888 (Ala.Civ.App. 2001)).
Because no express contract existed between CIT and Roberts and Good Hope and because the stipulated facts reveal no evidence of an implied contract in fact between the parties, in order to rule in favor of Roberts and Good Hope the trial court had to find that an implied contract in law existed between CIT and Roberts and Good Hope by virtue of Roberts and Good Hope's providing storage for the equipment in which CIT had a first priority security interest. See Green v. Hospital Bldg. Auth. ofBessemer, 294 Ala. 467, 470, 318 So.2d 701, 704 (1975). In other words, the trial court had to rule that Roberts and Good Hope rendered a service for which Roberts and Good Hope had a reasonable expectation of being compensated for by CIT. See UtahFoam Products, Inc. v. Polytec, Inc., 584 So.2d 1345, 1350 (Ala. 1991); Richards v. Williams, 231 Ala. 450, 453, 165 So. 820,823 (1936). Therefore, the trial court apparently reasoned, the law must imply that CIT promised to pay a reasonable value for the service rendered, i.e., the storage of the equipment.
However, in order to reach this result it must be concluded that CIT knowingly accepted the service provided by Roberts and Good Hope. The rule quoted in Associates Commercial Corporation,supra, from Richards v. Williams — that "if one knowingly
accepts services rendered by another, and the benefit and result thereof, the law implies a promise on the part of the one who so accepts with knowledge, to pay the reasonable value of such services rendered," 231 Ala. at 453, 165 So. at 823 (emphasis added) — has been reiterated on numerous occasions in Alabama cases. See, e.g., Hendrix, Mohr Yardley, Inc. v. City ofDaphne, 359 So.2d 792, 795-96 (Ala. 1978); Nix v. Purnell,267 Ala. 430, 432, 103 So.2d 331, 332 (1958); and Frank CrainAuctioneers, Inc. v. Delchamps, 797 So.2d 470, 474 (Ala.Civ.App. 2000). Thus, it is clear that knowledge that the service is being rendered is key to a court being permitted to imply a contract in law between parties where none exists in fact.
The trial court concluded that CIT knowingly accepted the service rendered by Roberts and Good Hope through imputed knowledge: it ruled that B.R. Armstrong's knowledge that the equipment was located at Good Hope's facility was "imputed" to CIT. If CIT can be charged with knowing where the equipment was located from September 1, 2000, to May 31, 2001, then it is reasonable to imply that CIT accepted the storage services provided by Roberts and Good Hope.
However, there is no basis — either in the stipulated facts or in the law — for imputing B.R. Armstrong's knowledge to CIT. The trial court cites no authority for its ruling, Roberts and Good Hope fail to cite any authority in support of this ruling in their brief to this court, and this court is unaware of any authority that permits an imputation of knowledge under these facts.
Knowledge of one person is generally only imputed to another where there exists a special legal relationship between the two, such as where the knowledge of an agent may be imputed to the principal, see, e.g., Williams v. Fundaburk, 237 Ala. 30, 32,185 So. 383, 384 (1938), the knowledge of an attorney is imputed to his *Page 191 
or her client, see, e.g., Ball v. Vogtner, 362 So.2d 894, 898
(Ala. 1978), or the knowledge of one partner in a partnership is imputed to all the partners, see, e.g., 59A Am.Jur.2dPartnership § 209 (2003). Even in those relationships, though, imputation of knowledge may only be found under certain circumstances. See, e.g., Williams v. Fundaburk,237 Ala. at 32, 185 So. at 384 ("The knowledge of an agent may be imputed to the principal as a matter of law, creating an incontestable presumption; but that arises only when the agent acquires the knowledge as an incident to the transaction of the business of the principal."); Ball, 362 So.2d at 898 ("Our cases hold that for knowledge of the attorney to be imputed to the client, the knowledge must have come to the attorney while engaged in a service for his client after the attorney-client relationship began.").
In describing the theory behind imputed knowledge between a principal and an agent, one bankruptcy court explained:
 "The theory, known as the `imputed knowledge rule,' upon which imputation of knowledge from an agent to its principal rests is that, when the agent acts within the scope of the agency relationship, there is identity of interests between principal and agent. The presumption upon which imputation rests is that the agent will perform his duty and communicate to his principal the facts that the agent acquires while acting within the scope of the agency relationship. 3 Fletcher Cyc. Corp. § 390 (rev. ed. 1994)."
Waswick v. Stutsman County Bank (In re Waswick), 212 B.R. 350,353 n. 3 (Bankr.D.N.D. 1997) (emphasis added). Under the facts of this case, including the debtor's cessation of business operations and its pending bankruptcy, we cannot conclude that an "identity of interests" existed between B.R. Armstrong or the debtor and CIT concerning whether CIT would pick up the equipment from Good Hope's storage facility.
Even though none of the authorities cited above speak directly to the issue in this case, those authorities on imputed knowledge are sufficient to show that the trial court's action in this case was unwarranted. B.R. Armstrong's knowledge of the location of the equipment may not be imputed to CIT. Without such knowledge, it is apparent that CIT did not knowingly accept the storage services provided by Roberts and Good Hope, and, therefore, no contract between Roberts and Good Hope and CIT may be implied in law in this case. In the absence of a contract, there is no basis for ordering CIT to pay Roberts and Good Hope fees for storing the equipment. Accordingly, the trial court's judgment in favor of Roberts and Good Hope is reversed, and the case is remanded to the trial court to enter a judgment consistent with this opinion.
REVERSED AND REMANDED.
YATES, P.J., and THOMPSON and PITTMAN, JJ., concur.
CRAWLEY, J., dissents, without writing.