**STORER CABLE COMMUNICATIONS, INC., et al., Plaintiffs,**

v.

**THE CITY OF MONTGOMERY, ALABAMA, et al., Defendants.**

Civ. A. No. 90–T–958–N.

United States District Court, M.D. Alabama, N.D.

June 17, 1993.

---

·James C. Cunningham, Jr., Terry S. Bienstock, Frates, Bienstock & Sheehe, Miami, FL, Robert A. Huffaker, Rushton, Stakely, Johnston & Garrett, Montgomery, AL, for plaintiffs.

Susan Russ Walker, Bradley Byrne, Miller, Hamilton, Snider & Odom, Tyrone C. Means, Mark Englehart, Cynthia Clinton, Anita Kelly, Thomas, Means & Gillis, Montgomery, AL, for defendant Montgomery Cablevision and Entertainment, Inc.

Robert A. Huffaker, Rushton, Stakely, Johnston & Garrett, P.A., Montgomery, AL, Terry S. Bienstock, Philip J. Kantor, Ira Hershkowitz, Bienstock & Clark, Miami, FL, for counterclaim defendants Storer Cable Communications, Inc., Satellite Services, Inc., Tele–Communications, Inc. and ESPN, Inc.

Solomon S. Seay, Jr., Montgomery, AL, Alan Shor, John J. Dalton, Mark S. Vander-Broek, Jim Lamberth, Thomas E. Campbell, June Kirkland, Richard Ford, Troutman Sanders, Ralph Greil, Atlanta, GA, for counterclaim defendants Turner Broadcasting System, Inc., Turner Network Television, Inc. and Turner Cable Network Sales, Inc.

Stephen N. Dodd, Mary Elizabeth Culberson, Office of Atty. Gen., James Evans, Alabama State House, Montgomery, AL, for State of Alabama.

W. Joseph McCorkle, W. Joseph McCorkle, Jr., Maury D. Smith, Balch & Bingham, Montgomery, AL, for City of Montgomery.

## ORDER

MYRON H. THOMPSON, Chief Judge.

Several cable television companies initially brought this lawsuit against defendant City of Montgomery, Alabama, challenging the legality of two municipal ordinances. The plaintiffs—Storer Cable Communications, Inc., ESPN, Inc., Satellite Services, Inc., and Turner Network Television, Inc.—contended that the ordinances violated a number of federal constitutional provisions and statutes, as well as Alabama law. Montgomery Cablevision Entertainment, Inc., a new local cable television operator in Montgomery, intervened as a defendant and filed a counterclaim against the plaintiffs and Tele–Communications, Inc., Turner Broadcasting Systems, Inc., and Turner Cable Network Sales, Inc. As the counterclaim plaintiff, Montgomery Cablevision charges these counterclaim defendants with violating the following federal, state, and municipal antitrust laws: §§ 1 & 2 of the Sherman Act, 15 U.S.C.A. §§ 1, 2; 1975 Ala.Code § 6–5–60; Alabama state common law governing monopolies; and City of Montgomery Ordinance 48–90 §§ 3, 4. The cable company also charges the counterclaim defendants with the state-law tort of intentional interference with business relations. Montgomery Cablevision seeks declaratory and injunctive relief and treble damages pur-

suant to § 4 of the Clayton Act, 15 U.S.C.A. § 15(a).[1]

On October 9, 1992, this court entered an order regarding the validity of the two municipal ordinances. The court found that federal law preempted certain aspects of the ordinances, but declared the ordinances to be valid in other respects. *See Storer Cable Communications, Inc. v. City of Montgomery*, 806 F.Supp. 1518 (M.D.Ala.1992) (Thompson, J.). This cause is again before the court, this time on motions to dismiss filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure by the counterclaim defendants. They contend that Montgomery Cablevision has failed "to state a claim upon which relief can be granted" in its counterclaim. Fed.R.Civ.P. 12(b)(6). For the reasons that follow, the court concludes that the motions to dismiss should be denied.

## I. BACKGROUND

The allegations of Montgomery Cablevision's counterclaim are as follows. The production, transmission, distribution, and sale of cable television programming is a major industry in the United States, grossing billions of dollars in annual sales. This industry affects interstate commerce, and the parties involved in this litigation transact business in interstate commerce.

Cable television programming is produced by "program suppliers" or "programming services," such as Turner Network and ESPN, who develop and produce a variety of television programs. Program suppliers contract with distributors, such as Satellite Services, to distribute their programs to cable television "exhibitors" or "operators," who own local cable television systems. Cable television operators, such as Storer Cable, Montgomery Cablevision, and Tele–Communications, receive the programming by satellite and exhibit the programming to subscribers on local cable television systems for a monthly fee in particular service areas. The

provision of programming to subscribers is often referred to as "retail cable sales."

According to Montgomery Cablevision, most local markets for cable television service in the United States are de facto monopolies. Because the market for retail sales of cable television is a capital intensive industry, there are substantial barriers to entry into the market. Moreover, "overbuilders," or new entrants into local cable services markets, have had to face a variety of anticompetitive practices by incumbent monopolists intent on foreclosing markets to the newly franchised cable operators.[2] For example, existing local operators secure exclusive dealing contracts with program suppliers to shut new competitors out of programming critical to their ability to compete with the incumbent cable franchise. In some cases, these exclusive dealing contracts are carried out by a program supplier who is vertically integrated with a local cable system operator or who has ownership or managerial interests in it.

In 1990, Montgomery Cablevision was awarded a new franchise by the City of Montgomery to provide cable television services to subscribers in the Montgomery area. It is currently in the start-up phase of providing such services and intends to compete directly with Storer Cable, which has been providing cable television services to subscribers in the Montgomery area since 1976. Montgomery Cablevision plans to offer consumers more channels, superior picture quality, more responsive customer service, and competitive prices in the retail cable television services market.[3] Before Montgomery Cablevision received its franchise in 1990, Storer Cable was the only cable television company operating in the Montgomery area. Storer Cable currently provides service to 92% of the homes in the Montgomery area that subscribe to cable television.

---

**1.** Jurisdiction is premised on the following: 15 U.S.C.A. §§ 15, 26; 28 U.S.C.A. §§ 1331, 1337; and the doctrine of supplemental jurisdiction, 28 U.S.C.A. § 1367.

**2.** The term "overbuilder" refers to a cable television operator who enters an area already served by an existing local cable operator and who must

build over the operations of the incumbent franchisee.

**3.** This market is also referred to as the "retail cable sales market" or the "multi-channel video services market."

To begin providing competitive cable services, Montgomery Cablevision has acquired property and equipment, built and installed a receiving station, contracted for system mapping, design, and engineering, hired and trained sales people, placed advertisements, and begun selling subscriptions in certain areas of Montgomery. It has also attempted to secure long-term contracts with suppliers of attractive and competitive cable programs. For example, in May 1990, Montgomery Cablevision approached Turner Cable Network Sales, a company engaged in the business of programming sales, to request an affiliation contract to carry the Turner Network program service. Turner Network, a cable television program supplier, produces a television program service consisting of Metro–Goldwyn–Mayer ("MGM") movies, dramatic shows, situation comedies, game shows, special children's programming, entertainment programming, and sports programs, including National Football League ("NFL") games and National Basketball Association ("NBA") playoff games.[4] Later that month, Turner Cable Network Sales informed Montgomery Cablevision that it would not sell the Turner Network program service to the cable company. In August 1990, Montgomery Cablevision made a second request for a contract to carry the Turner Network program service, which was again denied. On or about the time that Montgomery Cablevision requested a contract to carry the Turner Network program service, Storer Cable entered into an exclusive contract for it. The Turner companies are allegedly vertically integrated with Storer Cable or otherwise financially or managerially related or affiliated with it.[5]

In May 1990, Montgomery Cablevision requested an affiliation contract also from ESPN to carry ESPN's NFL Football Package. This package consists of three pre-season NFL games, eight regular season Sunday night NFL games, and the post-season Pro Bowl. ESPN refused to sell its NFL package to Montgomery Cablevision. In August 1990, Montgomery Cablevision again requested the NFL package from ESPN, which was again denied. At the same time, Storer Cable received an affiliate contract for the NFL package from ESPN. Moreover, Storer Cable entered into an exclusive contract with ESPN, which provided that none of Storer Cable's competitors in the Montgomery area would receive ESPN's football package.

According to Montgomery Cablevision, ESPN's football programming and the Turner Network program service—in particular, the Sunday night NFL games—are demanded or desired by a substantial number of current and potential cable subscribers in the Montgomery area. Moreover, this particular programming is not available from any other cable programming source. Montgomery Cablevision maintains that, because of the exclusive contracts, it has been placed at a competitive disadvantage with regard to Storer Cable, which is able to offer this highly desirable programming to its customers. It has encountered substantial difficulty in signing up subscribers and obtaining financing; it has also suffered a reduction in the value of its business exceeding three million dollars.[6]

Montgomery Cablevision contends that not only has it suffered injuries but the exclusive dealing arrangements among the counterclaim defendants have hindered and restrained competition among cable operators in the Montgomery market in price, service, quality of transmission and facilities, and cable programming, in violation of federal, state, and municipal antitrust law. Mont-

---

4. Montgomery Cablevision alleges that both Turner Cable Network Sales and Turner Network are wholly-owned subsidiaries of Turner Broadcasting Systems, Inc., which is engaged in the business of producing and distributing cable television programming.

5. Montgomery Cablevision also alleges that Tele–Communications, the largest cable television operator in the United States, and Satellite Services, a cable television program distributor, are

vertically integrated with Storer Cable or otherwise financially or managerially related to it.

6. Montgomery Cablevision also alleges that its franchise from the City of Montgomery requires it to build over 200 miles per year over a five-year period with penalties of $250,000 per year for failure to meet that goal. The denial of the Turner Network program service and ESPN's football package jeopardizes its ability to meet its franchise requirements.

gomery Cablevision also maintains that Storer Cable entered into the exclusive contracts with Turner Network and ESPN with the specific intent and purpose of protecting its monopoly on the provision of cable television services in the Montgomery area and of foreclosing competition in this area, also in violation of federal, state, and municipal antitrust law. Montgomery Cablevision further contends that, by agreeing to these exclusive contracts for programming, the counterclaim defendants who are cable television program suppliers and distributors—that is, Tele-Communications, Satellite Services, the Turner companies, and ESPN—have assisted Storer Cable in its efforts to monopolize the Montgomery market for cable television services and to restrain competition. Finally, Montgomery Cablevision charges the counterclaim defendants with intentional interference with business relations; it contends that it has "initiated or commenced business relationships both with individuals who have subscribed or wish to subscribe" to Montgomery Cablevision's services and that the exclusive dealing arrangements among the counterclaim defendants were "intended to disrupt and did disrupt these relationships."

## II. STANDARD FOR MOTION TO DISMISS

The counterclaim defendants contend that Montgomery Cablevision's counterclaim fails to allege sufficient facts to state a claim under federal, state, or municipal antitrust law. They also maintain that Montgomery Cablevision has failed to state a claim for intentional interference with business relations. Consequently, they contend that Montgomery Cablevision's entire counterclaim should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

In evaluating a claim to determine whether it adequately states a claim for relief, the court must accept the facts pleaded as true and construe them in a light most favorable to the claimant. *Brower v. County of Inyo,* 489 U.S. 593, 598, 109 S.Ct. 1378, 1382, 103 L.Ed.2d 628 (1989); Fed.R.Civ.P. 12(b). A motion to dismiss may not be granted unless it appears beyond a reasonable doubt that "no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984); *accord Luckey v. Harris,* 860 F.2d 1012, 1016 (11th Cir.1988), *cert. denied,* 495 U.S. 957, 110 S.Ct. 2562, 109 L.Ed.2d 744 (1990).

It is also well-settled that notice pleading is all that is necessary for a valid claim. The system of notice pleading set up by the Federal Rules of Civil Procedure requires that a claim include only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). As the Supreme Court recently reaffirmed, this rule means that a claimant need only "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* ⸺ U.S. ⸺, ⸺, 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517 (1993) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957)). The rule "do[es] not require a claimant to set out in detail the facts upon which he bases his claim." *Id.* Moreover, this "liberal system of 'notice pleading'" applies to all causes of action unless otherwise specified in the rules, such as the particularity requirement imposed by Rule 9(b) for averments of fraud or mistake. *Id.* The Supreme Court explained that "Perhaps if Rules 8 and 9 were rewritten today, [other] claims ... might be subjected to the added specificity requirement of Rule 9(b)." *Id.* "But that is a result which must be obtained by the process of amending the Federal Rules, and not by judicial interpretation," the Court continued. *Id.* "In the absence of such an amendment, federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims sooner rather than later." *Id.*

In the wake of the Supreme Court's reaffirmation and admonition in *Leatherman* that the liberal pleading requirements of the Federal Rules apply to all causes of action unless otherwise specified in the rules, it is no longer open to question that Rule 8(a)(2) applies in full force to anti-

trust actions. Courts may no longer demand as they did in the past, out of a perceived "danger of abuse of the antitrust laws," that a claimant provide a "detailed pleading beyond the general notice requirements of rule 8(a)(2)." *Quality Foods de Centro America, S.A. v. Latin Am. Agribusiness Dev. Corp.,* 711 F.2d 989, 995 (11th Cir.1983). Nevertheless, the liberal pleading requirements of the Federal Rules do not negate the need to plead sufficient facts so that each element of the alleged antitrust violation can be identified. *Municipal Util. Bd. v. Alabama Power Co.,* 934 F.2d 1493, 1501 (11th Cir.1991). An antitrust complaint "must comprehend a so-called prima facie case." *Quality Foods,* 711 F.2d at 995 (citation omitted). Moreover, conclusory allegations of antitrust violations will not survive a motion to dismiss "if not supported by facts constituting a legitimate claim for relief." *Municipal Util. Bd.,* 934 F.2d at 1501 (citation omitted). The alleged facts, however, "need not be spelled out with exactitude, nor must recovery appear imminent." *Id.*

■ Finally, in testing an antitrust under Rule 12(b)(6), a court should be very circumspect in applying "substantive legal rule[s]" to market conditions based on a factually undeveloped record. *Eastman Kodak Co. v. Image Technical Serv., Inc.,* — U.S. —, —, 112 S.Ct. 2072, 2082 (1992). As the Supreme Court recently cautioned, "Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law." *Id.* Courts should "resolve antitrust claims on a case-by-case basis, focusing on the 'particular facts disclosed by the record,'" *id.* (quoting *Maple Flooring Mfrs. Ass'n v. United States,* 268 U.S. 563, 579, 45 S.Ct. 578, 583, 69 L.Ed. 1093 (1925)), that is, after the court "has examined closely the economic reality of the market at issue." *Eastman Kodak,* — U.S. at —, 112 S.Ct. at 2082. Generally, unless the court can conclude beyond a doubt—after applying an economic approach which is not subject to serious question and which, if possible, has a sound empirical basis—that the complainant's underlying theory is "economically senseless," *id.* at —, 112 S.Ct. at 2083, the complainant should be allowed to proceed with factual development, including expert testimony regarding the "economic reality of the market at issue."

## III. SECTION ONE OF THE SHERMAN ACT

As stated, Montgomery Cablevision claims that the exclusive dealing arrangements among the counterclaim defendants have hindered and restrained competition among cable operators in the Montgomery area market. The cable company charges the counterclaim defendants with violating § 1 of the Sherman Act, 15 U.S.C.A. § 1, and seeks treble damages under § 4 of the Clayton Act, 15 U.S.C.A. § 15(a).[7]

### A. Elements

■ To recover under § 1 of the Sherman Act, Montgomery Cablevision must establish three elements. It must show that the counterclaim defendants (1) entered into "a contract, combination ..., or conspiracy," which was (2) "in restraint of trade or commerce." 15 U.S.C.A. § 1. The cable company must further show (3) that it was damaged by the violation, thereby entitling it to treble damages under § 4 of the Clayton Act. *Orval Sheppard Real Estate Co., Inc. v. Valinda Freed & Assoc., Inc.,* 608 F.Supp. 354, 357 (M.D.Ala.1985) (Thompson, J.), *aff'd* 800 F.2d 265 (11th Cir.1986) (Table).[8]

---

**7.** Section 1 of the Sherman Act provides in pertinent part:

> "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

15 U.S.C.A. § 1. Section 4 of the Clayton Act provides in pertinent part:

> "[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws ... shall recover threefold the damages by him sustained."

15 U.S.C.A. § 15(a).

**8.** To invoke the jurisdiction of the Sherman Act, a claimant must show "(1) that the local activity has a (2) substantial effect on (3) interstate commerce." *El Shahawy v. Harrison,* 778 F.2d 636, 639 (11th Cir.1985). Because "the antitrust laws are concerned primarily with the integrity of interstate markets," the Eleventh Circuit Court of Appeals requires that a determination of Sherman Act jurisdiction "focus on the interstate markets involved in the defendant's business activities." *Id.* at 640 (citation omitted). In this

■ As to the first element, § 1 of the Sherman Act does not prohibit independent business decisions and actions. *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984); *Tidmore Oil Co., Inc. v. BP Oil Co./Gulf Prod. Div.*, 932 F.2d 1384, 1388 (11th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 339, 116 L.Ed.2d 279 (1991). Section 1 addresses concerted action and therefore requires some agreement, express or implied, between two or more persons. *Monsanto Co.*, 465 U.S. at 761, 104 S.Ct. at 1469. The first inquiry in any § 1 claim, then, is to locate the agreement that restrains trade. *Tidmore Oil*, 932 F.2d at 1388.

■ As to the second element, § 1 of the Sherman Act does not prohibit all agreements that restrain trade or commerce. The section is understood to prohibit only those that impose "unreasonable restraints" on trade. *NCAA v. Bd. of Regents*, 468 U.S. 85, 98, 104 S.Ct. 2948, 2959, 82 L.Ed.2d 70 (1984). *Accord Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1455 (11th Cir.1991). Certain agreements subject to § 1 have been held to be per se illegal, meaning that no demonstration of an unreasonable restraint on competition is required. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628 (1984).[9] Other types of agreements, such as "exclusive dealing" arrangements, are subject to a "rule of reason" analysis. *Id.; see also Graphic Prod. Distrib., Inc. v. Itek Corp.*, 717 F.2d 1560, 1566 n. 7 (11th Cir. 1983).

■ Under the rule of reason, a restraint is considered unreasonable "if it has an adverse impact on competition and cannot be justified as a procompetitive measure." *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1569 (11th Cir.1991). Thus, proof of actual competitive injury or anti-competitive effect is required to establish an unreasonable restraint of trade. *Constr. Aggregate Transp., Inc. v. Florida Rock Ind., Inc.*, 710 F.2d 752, 773 (11th Cir.1983); *Muenster Butane, Inc. v. Stewart Co.*, 651 F.2d 292, 295 (5th Cir. Unit A July 1981).[10] As the court of appeals explained in *Constr. Aggregate Transp.*:

> "This sort of arrangement, referred to as 'exclusive dealing,' does not give rise to antitrust liability without proof of actual competitive injury. Implicit in the freedom to deal exclusively with one merchant, of course, is the freedom to refuse to deal with a competitor of that merchant."

710 F.2d at 773.

In determining whether there has been an unreasonable restraint of trade, the factfinder "weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977). The circumstances to be considered include "the facts peculiar to the business to which the restraint is applied[,] its condition before and after the restraint was imposed[,] the nature of the restraint and its effect, actual or probable," *Bd. of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918); they also include "[t]he history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained." *Id.*

■ In determining whether a vertical exclusive dealing arrangement between a supplier and an operator has resulted in an impermissible restraint of trade among cable operators in a local market, the focus of the court should be on "consumer welfare."

---

case, Montgomery Cablevision has sufficiently alleged that the counterclaim defendants are substantially involved in interstate commerce to meet the jurisdictional requirement of the Sherman Act. *See id.* at 641.

9. Examples of per se prohibited combinations are price fixing, group boycotts, and market division agreements. *Copperweld Corp.*, 467 U.S. at 768, 104 S.Ct. at 2740.

10. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

*Graphic Prod. Distrib.,* 717 F.2d at 1572 n. 20. The court must determine whether the restraint has had "a substantial adverse effect on consumer welfare by eliminating an important source of competitive pressure on price." *Id.* To do this, the court must examine competition and market power in not only the local market of cable operators—called the "intrabrand" market—but also in the broader market of cable program suppliers—called the "interbrand" market. *See, e.g., Continental T.V.,* 433 U.S. at 51–57, 97 S.Ct. at 2558–2561; *Graphic Prod. Distrib.,* 717 F.2d at 1571–73.[11] This is true because, without market power at the interbrand level, a supplier's refusal to deal with a distributor or operator in the intrabrand market would not allow either the supplier or operator to set prices unaffected by a competitive market and thus create an overall anti-competitive effect. *Id.* As then Professor, now Judge, Richard Posner has explained, the rationale for assessing the market power of a supplier in antitrust analysis is that:

> "The absence of market power in the interbrand market implies that the defendant is in competition with firms that sell products regarded by the consumer as close substitutes for the defendant's. The defendant therefore will lose most or all of its sales if its retail price exceeds its competitors' retail price for any reason, including a lack of intrabrand competition that drives its costs of distribution up.... [I]f a firm lacks market power, it cannot affect the price of its product; that price is determined by the market."

Richard A. Posner, *The Next Step in the Antitrust Treatment of Restricted Distribution: Per Se Legality,* 48 U.Chi.L.Rev. 6, 16 (1981). Or to put it another way, "when interbrand competition exists ... it provides a significant check on the exploitation of intrabrand market power because of the ability of consumers to substitute a different brand of the same product." *Continental T.V.,* 433 U.S. at 52 n. 19, 97 S.Ct. at 2558 n. 19. Therefore, to mount a successful challenge to an exclusive dealing agreement between a program supplier and a cable television operator, a claimant must establish not only that there is a diminution or elimination of competition in the intrabrand market but also that the supplier has sufficient power to restrain trade in the interbrand market.

 The first step in determining whether competition has been foreclosed at the intrabrand level and whether a supplier has sufficient market power to restrain trade in the interbrand market is to identify the relevant markets, both the interbrand and intrabrand. As the Supreme Court explained in *Continental T.V.,* "an antitrust policy divorced from market considerations would lack any objective benchmarks." 433 U.S. at 53 n. 21, 97 S.Ct. at 2559 n. 21. A relevant market is defined generally as "the area of effective competition," *Brown Shoe Co. v. United States,* 370 U.S. 294, 324, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962) (citation omitted). The outer boundaries of a relevant market are determined by "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Id.* (quoting *Brown Shoe Co.,* 370 U.S. at 325–26, 82 S.Ct. at 1523–24).[12] Within a broad market, there may also exist well-defined submarkets, which in, themselves, constitute markets for antitrust purposes. *Brown Shoe Co.,* 370 U.S. at 325, 82 S.Ct. at 1524. *See also Fineman v. Armstrong World Indus., Inc.,* 980 F.2d 171, 199 (3rd Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1285, 122 L.Ed.2d 677 (1993); *T. Harris Young & Assoc., Inc. v. Marquette Elec.,* 931 F.2d 816, 824 (11th Cir.1991); *L.A. Draper & Son,* 735 F.2d at 423. The boundaries of a submarket are determined by a number of factors.

11. Generally, interbrand competition is defined as competition among suppliers or manufacturers of the same generic product, while intrabrand competition is the competition between distributors—wholesale or retail—of the product of a particular supplier or manufacturer. *Continental T.V.,* 433 U.S. at 52 n. 19, 97 S.Ct. at 2558 n. 19. In the cable industry, interbrand competition would include competition among program suppliers, while intrabrand competition would occur among cable television operators.

12. *See also L.A. Draper & Son v. Wheelabrator-Frye, Inc.,* 735 F.2d 414, 423 (11th Cir.1984) (the product dimension is determined by "the availability of substitutes to which consumers can turn in response to price increases and other

These include: industry or public recognition of the submarket as a separate economic entity; the product's peculiar characteristics and uses; unique production facilities; distinct customers; distinct prices; sensitivity to price changes; and specialized vendors. *Brown Shoe Co.*, 370 U.S. at 325, 82 S.Ct. at 1524; *T. Harris Young*, 931 F.2d at 824. Thus, if a product is specially designed for a distinct group of purchasers, and there is an almost exclusive concentration of efforts on those purchasers, the relevant market for antitrust purposes may be limited to the sale of that product to those purchasers. *See, e.g., Heatransfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d 964, 980–81 (5th Cir.1977) (relevant market consisted of sale of air conditioners for only Volkswagen, Porsche, and Audi automobiles, rather than sale of air conditioners for all automobiles), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978). Similarly, where one product is distinct from another because of its salability to customers, the relevant market can consist solely of that product. *See, e.g., Int'l Boxing Club of New York, Inc. v. United States*, 358 U.S. 242, 250–52, 79 S.Ct. 245, 250–51, 3 L.Ed.2d 270 (1959) (because of high salability of championship boxing contests, as opposed to non-championship fights, relevant market consisted of only championship boxing contests).

■■■■ Once the relevant markets are defined, a court then must determine whether there is a diminution or elimination of competition in the intrabrand market and whether the supplier has sufficient power to restrain trade in the interbrand market. The counterclaim alleges that Storer Cable provides cable television services to 92% of the homes in the Montgomery area. With this allegation, the counterclaim raises a substantial factual allegation as to whether competition in the intrabrand market has been substantially reduced if not completely fore-

closed.[13] Indeed, a 92% market share would be considered an indicator of monopoly power. *See Eastman Kodak Co.*, —— U.S. at ——, 112 S.Ct. at 2090 (80–95% of market is a monopoly); *United States v. Grinnell Corp.*, 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966) (87% of the market is a monopoly). The critical question for the court, therefore, is whether Montgomery Cablevision has sufficiently alleged that the program suppliers have interbrand market power.

■■■■ Market power is "the ability to raise price significantly above the competitive level" without losing a substantial portion of one's business. *Graphic Prod. Distrib.*, 717 F.2d at 1570.[14] Because market power is conceptually difficult to define in any given case, two criteria are used to measure it: (1) market share and (2) product differentiation. *Id. See also MHB Distrib., Inc. v. Parker Hannifin Corp.*, 800 F.Supp. 1265, 1270–71 (E.D.Pa.1992). Market share is used as an indicator of market power because it relates directly to a supplier's ability to affect competition. *Graphic Prod. Distrib.*, 717 F.2d at 1570. Product differentiation is examined because where it exists, "a company will have additional freedom to raise the price of its product above that of competing brands while still retaining a substantial portion of its business." *Id.* at 1570 n. 15.[15] Thus, where there is strong product differentiation, significant market power may exist without market dominance. *See* 8 Phillip E. Areeda, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* § 1604f at 60 (1989).

■■■■ After it is shown that competition in the intrabrand market has been reduced or eliminated and that a supplier has interbrand market power, it is then necessary to deter-

---

existing or potential producer's ability to expand output").

**13.** The counterclaim defendants have raised no real dispute that the relevant market at the intrabrand level of competition in this case is the retail cable television sales market in the Montgomery area.

**14.** Market power has also been defined as the power "to force a purchaser to do something

that he would not do in a competitive market." *Jefferson Parish Hospital Dist. No. 2 v. Hyde*, 466 U.S. 2, 14, 104 S.Ct. 1551, 1559, 80 L.Ed.2d 2 (1984). Market power, however, differs from monopoly power. The former requires less market influence. *Eastman Kodak*, —— U.S. at ——, 112 S.Ct. at 2090.

**15.** Product differentiation may be based on styling, packaging, advertising, service and other non-price competition. *See Graphic Prod. Distrib.*, 717 F.2d at 1570 n. 15.

mine whether the vertical restraint—in this case, the exclusive dealing agreements—has an overall actual anti-competitive effect or purpose, that is, has eliminated or significantly diminished an important source of competitive pressure on price and thus has had a substantial adverse effect on consumer welfare. This determination is accomplished through a systematic comparison of any negative effects with any positive effects, that is, the negative effects of the restraint on both intrabrand and interbrand competition with any positive, that is, pro-competitive, effects on the interbrand market stemming from the restraint. *Graphic Prod. Distrib.*, 717 F.2d at 1571–1573. *See also Muenster Butane*, 651 F.2d at 296 ("Comparison of the effects of any vertical restriction on intrabrand and interbrand competition is the critical analysis required"). This comparison is necessary because, as the Supreme Court explained in *Continental T.V.*, under some circumstances a trade restriction has the potential simultaneously to reduce intrabrand competition and to stimulate interbrand competition. 433 U.S. at 51–52, 97 S.Ct. at 2558. Possible pro-competitive effects on interbrand competition that might stem from an intrabrand restriction include increased market access for the supplier, increased consumer services by the distributor, and enhanced product safety and quality. *See Continental T.V.*, 433 U.S. at 54–55, 97 S.Ct. at 2560; 8 Areeda, *Antitrust Law* § 1601 at 12–22. As Justice O'Connor has explained:

> "When the sellers of services are numerous and mobile, and the number of buyers is large, exclusive-dealing arrangements of narrow scope pose no threat of adverse economic consequences. To the contrary, they may be substantially pro-competitive by ensuring stable markets and encouraging long-term, mutually advantageous business relationships."

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 45, 104 S.Ct. 1551, 1575–76, 80 L.Ed.2d 2 (1984), (O'Connor, J. with whom Burger, C.J., and Powell and Rehnquist, JJ. join, concurring in judgment) (citation omitted).

On the other hand, where, for example, a supplier has considerable market power in the interbrand market, a distribution restriction may reduce intrabrand competition without stimulating interbrand competition. If a particular brand or product is powerful because of a lack of adequate alternative brands, the imposition of a trade restraint may serve to increase a supplier's and an operator's market power and competitive advantage. *See Graphic Prod. Distrib.*, 717 F.2d at 1571–73 & n. 20. *See also* Peter M. Gerhart, *The "Competitive Advantages" Explanation for Intrabrand Restraints: An Antitrust Analysis*, 1981 Duke L.J. 417, 426–29 (1981). In such situations, interbrand competition—or the absence thereof—fails to act as a significant check on the exploitation of intrabrand market power. *Graphic Prod. Distrib.*, 717 F.2d at 1572 & n. 20. The supplier and the operator may set prices and provide services in the intrabrand market unaffected by market competition and thus adverse to consumer welfare.

The required systematic comparison of negative and positive effects of the distribution restraint on intrabrand and interbrand competition should not be understood, as suggested by the counterclaim defendants, to require the claimant to show that the restraint has had an actual anti-competitive effect on interbrand competition. As Judge Tjoflat has explained, "The argument, pressed ... at length here, that the reduction or elimination of intrabrand competition is, by itself, never sufficient to show that a trade restraint is anticompetitive must rest, at bottom, on the view that intrabrand competition—regardless of the circumstances—is never a significant source of consumer welfare." *Graphic Prod. Distrib.*, 717 F.2d at 1572 n. 20. He responded that "This view is simply not supported by economic analysis, or by the cases." *Id.* He then explained that:

> "A seller with considerable market power in the interbrand market—whether stemming from its dominant position in the market structure or from the successful differentiation of its products—will necessarily have some power over price. In that situation, intrabrand competition will be a significant source of consumer welfare because it alone can exert downward pres-

sure on the retail price at which the good is sold. Dealers, by competing against each other and bidding the retail price down, will in turn exert downward pressure on the seller's wholesale price in order to maintain their profit margins. Thus, in situations of manufacturer market power, intrabrand restrictions on distributor competition can have a substantial adverse effect on consumer welfare by eliminating an important source of competitive pressure on price. Rather than promoting nonprice competition, vertical restraints in this context may enable a manufacturer to retain monopoly profits arising from an interbrand competitive advantage."

*Id.* Under the law of the Eleventh Circuit, therefore, if a supplier has considerable market power, a reduction or elimination of intrabrand competition alone may be sufficient to show that a trade restraint has an anti-competitive effect. *Graphic Prod. Distrib.,* 717 F.2d at 1572 & n. 20.[16]

■ To summarize, in determining whether a vertical restraint on trade—that is, a exclusive dealing arrangement—is unreasonable, it is necessary to analyze first the effect of the intrabrand restraints on consumer welfare, in light of the interbrand market structure, and then look to any possible pro-competitive effects on interbrand competition. *Graphic Prod. Distrib.,* 717

F.2d at 1573. A complainant need not show, however, an actual restraint on competition at the interbrand level to establish a violation of § 1 of the Sherman Act. Rather, in this circuit, the focus for the court is whether competition at the interbrand level adequately checks the exploitation of intrabrand market power.[17]

### B. Application of Elements

The counterclaim defendants contend that the § 1 Sherman Act claim against them should be dismissed for several reasons. First, they maintain that Montgomery Cablevision has not properly alleged the existence of a contract, combination, or conspiracy. Second, they contend that the counterclaim does not sufficiently allege relevant markets. Finally, they maintain that the counterclaim fails to allege the requisite anti-competitive effect on trade.

i.

■ First, the court finds that Montgomery Cablevision has sufficiently alleged the existence of "a contract, combination ..., or conspiracy" in restraint of trade. 15 U.S.C.A. § 1. Montgomery Cablevision contends that the conspiracy in this case centers on the exclusive dealing agreements between Storer Cable and Turner Network and between Storer Cable and ESPN.[18] Admitted-

**16.** This court therefore disagrees with the comment in *Futurevision Cable Systems of Wiggins, Inc. v. Multivision Cable TV Corp.,* 789 F.Supp. 760, 768 (S.D.Miss.1992), *aff'd,* 986 F.2d 1418 (5th Cir.1993) (Table), that a complainant "must allege anti-competitive effect at the interbrand level of competition" to establish § 1 Sherman Act violation.

**17.** The Supreme Court's 1992 decision in *Eastman Kodak* does not undermine, and indeed could be said to support, this economic approach. There, the court was similarly confronted with the economic relationship between a "primary" market and a "derivative" market or "aftermarket," albeit within the context of an alleged tying arrangement. —— U.S. at ——, 112 S.Ct. at 2076. The primary market was for a company's equipment and the aftermarkets were for that company's services and parts. The Court stated a economic truth equally applicable here, that "The extent to which one market prevents exploitation of another market depends on the extent to which consumers will change their consumption of one product in response to a

price change in another, i.e., 'cross-elasticity of demand.' " *Id.* at ——, 112 S.Ct. at 2083. The court observed that "there is no immutable physical law—no 'basic economic reality'—insisting that competition in the equipment market cannot coexist with market power in the aftermarkets." *Id.* at ——, 112 S.Ct. at 2084. The court then concluded, after engaging in a complex economic analysis, that there could conceivably be an impermissible restraint on trade in the aftermarket even in the absence of market power in the primary market. In reaching this conclusion, the Court admonished courts to rely on "actual market realities" rather than "[l]egal presumptions that rest on formalistic distinctions." *Id.* at ——, 112 S.Ct. at 2082.

**18.** Although the counterclaim alleges that several of the counterclaim defendants "contracted, combined or acted alone" to refuse to sell the Turner Network program service to Montgomery Cablevision, Montgomery Cablevision does not intend to pursue a § 1 claim against any unilateral behavior. Nor does it intend to pursue a group boycott theory at this time.

ly, the counterclaim generally uses the terms "contract" or "agreement," rather than "conspiracy," to refer to the exclusive dealings arrangements among the counterclaim defendants. But as the Eleventh Circuit Court of Appeals has stated, "there is no magic unique to each term." *Tidmore Oil Co., Inc. v. BP Oil Co./Gulf Prod. Div.*, 932 F.2d 1384, 1388 (11th Cir.), *cert. denied*, — U.S. ——, 112 S.Ct. 339, 116 L.Ed.2d 279 (1991). Rather, the terms are used interchangeably to describe the requisite agreement between two or more persons to restrain trade, *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1455 (11th Cir.1991), and courts sometimes simply refer instead to an "agreement." *Tidmore Oil*, 932 F.2d at 1388.

There are numerous references to the exclusive dealing agreements throughout the counterclaim. Montgomery Cablevision alleges that "exclusive dealing contracts between programmers and existing local operators" are one tactic that is used to shut out new competitors in the local cable services markets from programming critical to their ability to compete and offer comparable services. The cable company also states that Storer Cable is being provided "affiliate contracts" for the Turner Network program service and ESPN's football package, while Montgomery Cablevision has been denied these program services. Moreover, Montgomery Cablevision alleges that "Storer Cable agreed with ESPN to exclude competitors to Storer" from receiving the football programming and that there was an "agreement" to deny the Turner Network program service to Montgomery Cablevision. Finally, the cable company avers that the "exclusive agreements at issue" have caused injury to the competition.

 As to the participants in the conspiracy, Montgomery Cablevision's counterclaim charges that Tele–Communications, Satellite Services, Turner Broadcasting Systems, Turner Network, Turner Cable Network Sales, and Storer Cable have "combined, agreed or conspired" to refuse to enter into a contract with Montgomery Cablevision for the Turner Network program service. In support of this claim, Montgomery Cablevision alleges that it contacted Turner Cable Network Sales about an affiliation contract for Turner Network and that Turner Cable Network Sales communicated the refusal to sell the program service to Montgomery Cablevision. Shortly after this communication, Storer Cable received an exclusive contract with the Turner Network. Montgomery Cablevision further contends that Turner Network and Turner Cable Network Sales are wholly-owned subsidiaries of Turner Broadcasting Systems. For purposes of antitrust law, therefore, they are considered a single enterprise, with a unity of interest and purpose. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771–72 & n. 18, 104 S.Ct. 2731, 2741–42 & n. 18. Moreover, although a parent company *cannot conspire or combine with its wholly-owned subsidiaries* for antitrust purposes, *id.* at 769–71, 104 S.Ct. at 2740–41, a parent company and its subsidiaries can certainly conspire or agree with other parties for purposes of the antitrust laws. Based on the facts alleged in this case, it is plausible to infer that either Turner Network or Turner Cable Network Sales agreed with Storer Cable to enter into an exclusive contract in restraint of trade. As to the participation of Tele–Communications and Satellite Services, they are alleged to be "vertically integrated or otherwise financially or managerially related or affiliated corporations" with Storer Cable.

The court thus finds that these facts and allegations provide sufficient and fair notice to the counterclaim defendants as to the nature of Montgomery Cablevision's claim that they have "combined, agreed or conspired" in restraint of trade and as to the basis upon which it relies.

ii.

The court further finds that Montgomery Cablevision has sufficiently identified relevant markets. Because there are two levels of competition at issue this case—that is, the intrabrand and interbrand levels—two relevant markets must be considered.

 With regard to the intrabrand level of competition in this case, as noted previously, the counterclaim defendants have not put forward any serious dispute that the relevant

market is the retail cable television sales market in the Montgomery area. However, the parties hotly dispute how the market for interbrand competition should be defined.

Montgomery Cablevision contends that the broadest relevant market at the interbrand level is the cable programming market. However, because of the highly differentiated content of cable programs, Montgomery Cablevision also suggests that there are a number of economically significant submarkets within the cable television programming market. Given the structure of the cable television industry, it maintains that the relevant markets at the interbrand level of competition might be as narrow as the markets for Sunday night NFL games, telecast exclusively on ESPN and the Turner Network,[19] and for the other "major television" or "cream" events to which the Turner Network holds exclusive rights.[20]

In response, the counterclaim defendants who operate at the interbrand level of competition in this case—that is, the program suppliers and distributors—maintain that Montgomery Cablevision has alleged only that they have market power over their own products. They argue that the market cannot be defined by a defendant company's own product. The court, however, disagrees with this argument for two reasons. First, the counterclaim defendants appear to base this contention on the argument that a company does not violate the Sherman Act by virtue of the natural monopoly it holds over its own product and that it has a right to refuse to deal with those whom it chooses. But in *Eastman Kodak*, the Court noted that this "right is not absolute" and "exists only if there are legitimate competitive reasons for refusal." ⸺ U.S. at ⸺ n. 32, 112 S.Ct. at 2091 n. 32. Similarly, the former Fifth Circuit has written that "sellers do not have an antitrust *carte blanche* to select those with whom they will deal," *Aladdin Oil Co. v. Texaco, Inc.*, 603 F.2d 1107, 1115 (5th Cir. 1979); "a refusal to deal becomes unlawful when it produces an unreasonable restraint

on trade, i.e., if there is an anticompetitive purpose or effect in selecting those with whom one will deal." *Id.* "A refusal to deal," the court continued, "may not be used as a device to achieve some anticompetitive goal such as to acquire a monopoly ... or to establish market dominance and drive out existing competitors ... or to increase the seller's own market dominance." *Id.* at 1115–16 (footnotes omitted).

▪ But second and more importantly, the Supreme Court recently held that, in some instances, "one brand of a product can constitute a separate market" for antitrust purposes. *Eastman Kodak*, ⸺ U.S. at ⸺, 112 S.Ct. at 2090. That is, a company's own particular product can be a relevant market under the Sherman Act. As the Court explained, "The relevant market for antitrust purposes is determined by the choices available to [consumers]." *Id.* If there are no substitutes available, then a single brand of a product can be a proper market. *Id.* Here, Montgomery Cablevision has alleged that there are no substitutes for the programming at issue in this suit. The counterclaim clearly states that ESPN's NFL football package and the Turner Network program service, consisting of major television events such as NBA playoff games and MGM movies, "are not available from any other cable programming source and are widely demanded by cable consumers."

The counterclaim defendants, however, also contest Montgomery Cablevision's characterization of the relevant market at the interbrand level of competition in this case. They contend that it is neither the market of cable television programming nor the narrower markets of Sunday night NFL football and the special events programming available on the Turner Network. According to the counterclaim defendants, the proper market is the much broader market of passive visual entertainment, which includes programming for satellite television, video cassette recordings, and free over-the-air television. They further maintain that when this

---

**19.** The rights to televise Sunday night NFL games are divided between Turner Network and ESPN. Each telecasts 8 games per season.

**20.** These major television events include telecasts of certain NBA playoffs games and MGM movies that are carried exclusively on the Turner Network.

broader market is considered, it is impossible for Montgomery Cablevision to prove that they have sufficient market power to foreclose market alternatives and to create an unreasonable restraint on trade.

The court, however, agrees with Montgomery Cablevision that, if the structure of the cable television industry is taken into account and the factors relating to submarkets are considered, *see Brown Shoe Co.*, 370 U.S. at 325, 82 S.Ct. at 1524, it might be possible to establish that the relevant market at the interbrand level of competition is no broader than the market for cable programming and might be as narrow as the markets for Sunday night NFL football and for the Turner Network. For example, in *NCAA v. Bd. of Regents*, 468 U.S. 85, 112 n. 49, 104 S.Ct. 2948, 2966 n. 49, 82 L.Ed.2d 70 (1984), the Supreme Court concluded that there was "no doubt that college football constitutes a separate market for which there is no reasonable substitute." This separate market was based on "generic qualities differentiating viewers," and on the "unique appeal of NCAA football telecasts" for consumers. *Id.* at 112 & n. 49, 104 S.Ct. at 2966 & n. 49 (citation omitted). Similarly, in *Int'l Boxing Club of New York, Inc. v. United States*, 358 U.S. 242, 249–252, 79 S.Ct. 245, 249–251, 3 L.Ed.2d 270 (1959), the Court found that championship boxing events were uniquely attractive to fans; hence, they constituted a market separate from that for non-championship events.[21] *See also United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 172–73, 68 S.Ct. 915, 936, 92 L.Ed. 1260 (1948) (first-run movies, the "cream" of the exhibition business, constituted distinct market for antitrust analysis); *Syufy Enter. v. Am. Multicinema, Inc.*, 793 F.2d 990, 994–95 (9th Cir.1986)

(evidence supported finding that industry anticipated top-grossing films constituted market separate from exhibition of all other films), *cert. denied,* 479 U.S. 1031, 107 S.Ct. 876, 93 L.Ed.2d 830 (1987).

It is plausible to infer that factors similar to those in *NCAA v. Bd. of Regents* and *Int'l Boxing Club of New York* could be established in this case. As noted above, the counterclaim alleges that ESPN's football programming and the Turner Network program service—in particular, the Sunday night NFL games—are "demanded or desired by a substantial number of current or potential cable subscribers in Montgomery," and that this particular programming is "not available from any other cable programming source." Moreover, Montgomery Cablevision contends that it has "encountered substantial difficulty in signing up subscribers and obtaining financing" without this programming. These allegations indicate that Montgomery Cablevision may be able to prove that from the consumer's perspective—whose interests the antitrust statutes were especially intended to serve[22]—these highly popular programs are not interchangeable with other cable programs and that they are without substitutes. In other words, for consumers of these programs, there may be no comparable alternative programming available and thus no "cross-elasticity of demand between the product itself and substitutes for it." *T. Harris Young & Assoc., Inc. v. Marquette Elec.*, 931 F.2d 816, 824 (11th Cir.) (quoting *Brown Shoe Co.*, 370 U.S. at 325–36, 82 S.Ct. at 1523–24), *cert. denied,* —— U.S. ——, 112 S.Ct. 658, 116 L.Ed.2d 749 (1991).[23] Of course, the proper market definition in this case may be determined only after there has been a factual

---

21. The Court also noted:

"[N]umerous representatives of the broadcasting, motion picture and advertising industries testified to the general effect that a 'particular and special demand exists among radio broadcasting and telecasting [and motion picture] companies for the rights to broadcast and telecast [and make and distribute films of] championship contests in contradistinction to similar rights to non-championship contests."

358 U.S. at 251, 79 S.Ct. at 250.

22. *See Jefferson Parish Hosp. Dist. No. 2. v. Hyde,* 466 U.S. at 15, 104 S.Ct. at 1559–60.

23. In its brief in opposition to the motions to dismiss, Montgomery Cablevision also points out that the nature of the cable television industry, with its high channel capacity, is to reach a broad spectrum of targeted, specialized audiences through targeted, specialized programming. Consequently, there are numerous narrow programming submarkets that have "peculiar characteristics and uses," "distinct customers," and "specialized vendors." *See Brown Shoe Co.*, 370 U.S. at 325, 82 S.Ct. at 1524.

inquiry into the "commercial realities" faced by consumers. *Eastman Kodak,* —— U.S. at ——, 112 S.Ct. at 2072 (quoting *United States v. Grinnell Corp.,* 384 U.S. 563, 572, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966)). At this time, however, the court is satisfied that Montgomery Cablevision has pled sufficient facts indicating plausible relevant markets and has provided fair notice to the counterclaim defendants as to the nature of the markets at issue in this case.[24]

Furthermore, if there are separate markets for Sunday night NFL football and for the major television events broadcast on the Turner Network, as Montgomery Cablevision contends, then it appears that Turner Network and ESPN would possess sufficient market power to foreclose market alternatives. Turner Network and ESPN between them control all the NFL games broadcast on Sunday night. Turner Network also has complete control over the major television events broadcast on its network, including certain NBA playoff games and MGM movies. "When a product is controlled by one interest, without substitutes available in the

market, there is monopoly power." *NCAA v. Bd. of Regents,* 468 U.S. at 112, 104 S.Ct. at 2966 (quoting *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 394, 76 S.Ct. 994, 1006, 100 L.Ed. 1264 (1956)).[25] Thus, when submarkets and product differentiation are considered, it cannot be said that there is no set of facts that would show that the counterclaim defendants have sufficient market power in the relevant markets so as to foreclose market alternatives.[26]

iii.

■■■ Finally, the court concludes that Montgomery Cablevision's counterclaim sufficiently alleges an anti-competitive effect as a result of the exclusive dealing arrangements among the counterclaim defendants. First, Montgomery Cablevision has alleged that competition in the intrabrand market—that is, the market for cable television services—is all but eliminated. The counterclaim states that Storer Cable provides cable television services to 92% of the homes in the Montgomery area. As previously indicated, a 92% market share would be considered an

---

**24.** The cases cited by the counterclaim defendants to support their contention that the appropriate market for cable television services is the broader market of passive visual entertainment are not to the contrary. In those cases, the appropriate market for antitrust purposes was determined only after extensive fact-finding had been conducted. For example, in *Cable Holdings of Georgia, Inc. v. Home Video, Inc.,* 825 F.2d 1559 (11th Cir.1987), a *jury,* at the end of a trial, determined that the appropriate market for cable television services was passive visual entertainment, which included cable television, satellite television, video cassette recordings, and free over-the-air television. The appellate court upheld this finding as "not clearly erroneous." *Id.* at 1563. Similarly, in *Satellite Television & Associated Resources, Inc. v. Continental Cablevision of Virginia, Inc.,* 714 F.2d 351 (4th Cir.1983), *cert. denied,* 465 U.S. 1027, 104 S.Ct. 1285, 79 L.Ed.2d 688 (1984), a district court defined the relevant market in ruling on a motion for summary judgment. The court concluded that the provision of cable television services in that particular case was part of the broader market of "cinema, broadcast television, video disks and cassettes, and other types of leisure and entertainment-related businesses." *Id.* at 355. This determination, however, was reached only after the parties stipulated that customers perceived cable television services to be "reasonably interchangeable" with the offerings of movie theaters and that the cable companies were in competi-

tion with the wide variety of entertainment services enumerated above.

**25.** As the Court explained:

"It inexorably follows that if college football broadcasts be defined as a separate market—and we are convinced they are—then the NCAA's complete control over those broadcasts provides a solid basis for the District Court's conclusion that the NCAA possesses market power with respect to those broadcasts."

*NCAA v. Bd. of Regents,* 468 U.S. at 112, 104 S.Ct. at 2966.

**26.** This case therefore differs markedly from *Futurevision Cable Systems of Wiggins, Inc. v. Multivision Cable TV Corp.,* 789 F.Supp. 760 (S.D.Miss.1992), *aff'd,* 986 F.2d 1418 (5th Cir. 1993) (Table). There, the court dismissed a complaint brought by a new cable television company alleging that exclusive dealing arrangements between cable television programmers and an existing cable television operator violated the antitrust laws. However, no allegations were made regarding the market power of the programmers to foreclose market alternatives. *Id.* at 766–75. Moreover, comparable and competitive alternative programming appears to have been available. *Id.* at 769–70. It is also noteworthy, that in reaching its conclusions, the court in *Futurevision* did not consider the issue of submarkets nor product differentiation.

indicator of monopoly power, not merely of market power. *See Eastman Kodak,* ⸺ U.S. at ⸺, 112 S.Ct. at 2090. Montgomery Cablevision further alleges that the exclusive contracts granted to Storer Cable have had a negative effect on the intrabrand market in that they have reinforced Storer Cable's almost total market power.[27] The counterclaim specifically states that the denial of the Turner Network program service and ESPN's NFL package has unreasonably restrained competition in the Montgomery area market for retail cable television sales "by injuring the business and threatening the viability as a going concern of Storer Cable's only competitor": Montgomery Cablevision. The counterclaim goes on to allege that not only does this restraint harm Montgomery Cablevision, but it also "threatens, hinders and restrains competition in price, service, quality of transmission and facilities, and cable programming in the Montgomery area market for multi-channel video services." In other words, Montgomery Cablevision contends that the exclusive agreements act as "overbuild protection." They ensure that a new cable television operator in a given franchise area cannot compete effectively and successfully with the incumbent cable franchisee. Consequently, they discourage and foreclose competition in the provision of cable television services and deny to consumers "intrabrand choices that are sources of consumer welfare." *Graphic Prod. Distrib.,* 717 F.2d at 1571. *See also* Peter M. Gerhart, *The "Competitive Advantages" Explanation for Intrabrand Restraints: An Antitrust Analysis,* 1981 Duke L.J. 417, 439 (1981).[28]

█ In fact, the counterclaim further alleges that, because "[c]ompetition among programmers in the provision of program-

ming content at issue is limited," the elimination of intrabrand competition has particularly pernicious effects on consumer welfare. Montgomery Cablevision maintains that, because of the market power of some of the counterclaim defendants at the interbrand level of competition—that is, at the level of programming—interbrand competition in this case "does not act as a significant check on the exploitation of intrabrand market power among providers of cable services in Montgomery." In other words, consumers are unable to substitute other products for the products that are unavailable to them. In instances where a supplier has considerable market power in the interbrand market, as Montgomery Cablevision alleges is the case here, substantial reduction or elimination of intrabrand competition alone may be sufficient to show that a trade restraint is anti-competitive and therefore unreasonable. *Graphic Prod. Distrib.,* 717 F.2d at 1572 n. 20.[29]

Montgomery Cablevision also contends that the exclusive contracts not only reduce intrabrand competition but they also have negative effects at the interbrand level of competition. The counterclaim alleges that, by discouraging and foreclosing competition among cable television operators, the contracts eliminate precisely those sources who "otherwise could support alternative programming competitive with that supplied exclusively to the incumbents." That is, Montgomery Cablevision contends that, because the programming offered by Turner Network and ESPN is so highly desirable and non-interchangeable, the exclusive contracts threaten its very existence.[30] If Montgomery Cablevision is unable to survive, any support it could offer for alternative pro-

---

**27.** This market is alternatively referred to as the market for "multi-channel video services."

**28.** This litigation, therefore differs from *Futurevision,* 789 F.Supp. at 770, where the district court dismissed an anti-trust claim because of an absence of allegations that competition in provision of cable television services was adversely affected by exclusive contracts among programmers and incumbent franchisee.

**29.** *Contrast with Futurevision,* 789 F.Supp. at 769, where the court found that interbrand competition acted as a check on the exploitation of

intrabrand market power *and* that the effect of exclusive licenses on intrabrand competition was "insignificant."

**30.** The elimination of Montgomery Cablevision as a competitor to Storer Cable would alone not constitute a violation of § 1 of the Sherman Act. But when considered in conjunction with the overall effects on the intrabrand and interbrand markets, the elimination of Montgomery Cablevision as a provider of retail cable television services could be the basis of an antitrust injury.

gramming would be eliminated. Moreover, it is reasonable to infer from the counterclaim that even if Montgomery Cablevision is able to survive, the pro-competitive effects that could result from the exclusive contracts might be quite limited. Only a limited number of customers would take advantage of its enhanced services, such as superior service technology and channel capacity.[31]

Finally, it is possible that Montgomery Cablevision will also be able to establish that the exclusive dealing arrangements in this case were entered into for the benefit of and at the behest of the counterclaim defendants who operate at the retail level in this case— that is, the cable television exhibitors or operators. Although intrabrand restraints are often imposed by and for the benefit of suppliers or manufacturers, in some instances, distributors or dealers seek to have restraints imposed upon them by their supplier or manufacturer. Such arrangements are desired to restrict intrabrand competition and enhance distributor power by promoting excess prices and profits. In such cases, the supplier or manufacturer participates merely as the enforcement agent in furthering the distributor's anti-competitive conduct. *See Constr. Aggregate Transp., Inc. v. Florida Rock Indus., Inc.,* 710 F.2d 752, 774–76 & nn. 38–43. *See also* Richard A. Posner, *The Rule of Reason and the Economic Approach: Reflections on the "Sylvania" Decision,* 45 U.Chi.L.Rev. 1, 17–18 (1977); 8 Areeda, *Antitrust Law* § 1604 at 37–54. Suppliers will agree to such restraints to "appease dealer interests in excess profits or the quiet life." 8 Areeda, *Antitrust Law* § 1604 at 37. Although a supplier is often induced to accommodate distributor interests where a dealer cartel has been formed, an individually powerful dealer or distributor may also be able to coerce a supplier to restrict distribution. Because distribution restrictions are coerced from suppliers to further the monopolistic desires of a dealer, it is widely agreed that such restraints are anti-competitive and illegal. *Id.* at 38 ("a competition-limiting restraint extracted from [a manufacturer] by dealer power is generally understood to be anticompetitive"); Posner, *Reflections on*

*"Sylvania"* at 17 ("The goal is to isolate, and condemn, restrictions that are imposed nominally by the manufacturer but are in fact desired for monopolistic purposes by dealers using the manufacturer as their enforcement agent").

The most obvious circumstance in which an individual dealer is able to coerce a limitation on intrabrand competition is where the dealer possesses something approaching monopoly power in the relevant market. 8 Areeda, *Antitrust Law* § 1604 at 38. But a "dominant" dealer's request for a restraint might coerce a manufacturer in the same way. Dominance for this purpose is generally indicated by a distributor who has 30–50% of a manufacturer's local or total sales. *Id.* at 60–61, 70.

From the facts alleged in the counterclaim, it is plausible to infer that Storer Cable initiated the exclusive dealing arrangements with Turner Network and ESPN. Storer Cable allegedly provides cable television service to 92% of the homes in the Montgomery area. If this is true, it would undoubtedly qualify as a dominant dealer. The counterclaim also alleges that Tele–Communications is vertically integrated or otherwise financially or managerially related or affiliated with Storer Cable and that it represents itself as the largest provider of cable television services in America. It is therefore possible that Tele–Communications also has sufficient dealer power to demand exclusive contracts from Turner Network and ESPN. Furthermore, if, based on these facts, Montgomery Cablevision is able to prove that Storer Cable or Tele–Communications demanded the exclusive contracts, then the anti-competitive effects of the contracts could easily be established. As stated above, such a restriction is considered clearly anti-competitive because it diminishes consumer welfare by promoting the monopoly powers of the distributors. 8 Areeda, *Antitrust Law* § 1648 at 528. Moreover, where an exclusive dealing arrangement involves a product that itself has significant market power, as alleged here, the anti-

---

**31.** *Contrast with Futurevision,* 789 F.Supp. at 778 (exclusive contracts had pro-competitive effects on interbrand competition because comparable alternative programming was available).

**1360**

competitive effects are recognized as especially pernicious. *Id.* at § 1651 at 568.

In sum, the court concludes that Montgomery Cablevision has alleged sufficient facts to state a claim against the counterclaim defendants for a violation of § 1 of the Sherman Act. The necessary elements of a § 1 Sherman Act violation—that the counterclaim defendants entered into a conspiracy or combination that imposes an unreasonable restraint on trade—can be identified from the counterclaim.

## IV. SECTION TWO OF THE SHERMAN ACT

Montgomery Cablevision also charges the counterclaim defendants with monopolization, attempted monopolization, and conspiracy to monopolize in violation of § 2 of the Sherman Act, 15 U.S.C.A. § 2.[32]

### A. Monopolization

The offense of monopoly under § 2 of the Sherman Act has two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business, acumen, or historic accident." *Eastman Kodak,* —— U.S. at ——, 112 S.Ct. at 2089 (quoting *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1705, 16 L.Ed.2d 778 (1966)).

■ Montgomery Cablevision states in its brief in opposition to the motions to dismiss that its claim of monopolization is directed primarily at Storer Cable and its monopoly over the retail cable sales market in the Montgomery area. The other counterclaim defendants are implicated only insofar as they are financially or managerially related to Storer Cable. In support of the monopoly claim against Storer Cable, the counterclaim alleges that Storer Cable serves 92% of all cable television subscribers in the Montgomery area. As previously indicated,

if this contention is accepted as true, Storer Cable's control over the retail cable sales market in the Montgomery area would satisfy the first element of a § 2 claim of monopolization. *See Eastman Kodak,* —— U.S. at ——, 112 S.Ct. at 2090 (80–95% of market is a monopoly); *United States v. Grinnell Corp.,* 384 U.S. at 571, 86 S.Ct. at 1704 (87% of the market is a monopoly).

■ The second element of a § 2 claim is the use of monopoly power to "foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Eastman Kodak,* —— U.S. at ——, 112 S.Ct. at 2090 (citation omitted). Montgomery Cablevision alleges that Storer Cable entered into exclusive contracts for the Turner Network program service and ESPN's football package with the specific "purpose and intent to inhibit competition" and to "protect itself against overbuilders." Moreover, the factual allegations surrounding the formation of the contracts indicate that it is entirely plausible to infer that Storer Cable entered the contracts with the specific intent to maintain its monopoly over the Montgomery area market for retail cable television sales. Storer Cable secured its exclusive rights to carry the Turner Network program service and ESPN's football package on or about the time that Montgomery Cablevision requested affiliation contracts for this programming. Storer Cable's actions, therefore, could be seen as part of a scheme of willful acquisition or maintenance of its in violation of § 2 of Sherman Act. *See id.* at ——, 112 S.Ct. at 2090–91. Accordingly, the court finds that Montgomery Cablevision has adequately stated a claim of monopolization against Storer Cable.

### B. Attempted Monopolization

■ To establish the offense of attempted monopolization, it is necessary to prove "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly

---

**32.** Section 2 of the Sherman Act provides in pertinent part:

"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopo-

lize any part of the trade or commerce among the several States, or with foreign nations shall be deemed guilty of a felony."

15 U.S.C.A. § 2.

power." *Spectrum Sports, Inc. v. McQuillan,* — U.S. —, —, 113 S.Ct. 884, 890–91, 122 L.Ed.2d 247 (1993); *see also T. Harris Young & Assoc., Inc. v. Marquette Elec., Inc.,* 931 F.2d 816, 823 (11th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 658, 116 L.Ed.2d 749 (1991). Furthermore, as with the offense of monopolization, the attempt must occur in a defined relevant market. Thus, to demonstrate the dangerous probability of monopolization in an attempt case, it is also necessary to inquire into the relevant market and the defendant's economic power in that market. *Spectrum Sports,* — U.S. at —, 113 S.Ct. at 892; *accord T. Harris Young & Assoc.,* 931 F.2d at 823.

 As with its monopolization claim, Montgomery Cablevision maintains that the § 2 claim for attempted monopolization is directed toward only Storer Cable and those counterclaim defendants who are financially or managerially related to Storer Cable. The court finds that the allegations of the counterclaim, if accepted as true, sufficiently support a claim of attempted monopolization in violation of § 2 of the Sherman Act. First, with regard to the element of specific intent, as noted above, the counterclaim states that Storer Cable entered into the exclusive contracts with Turner Network and ESPN "with the purpose and intent to inhibit competition" and that Storer Cable "specifically intended to protect itself against overbuilders" in furtherance of its attempt to monopolize. Moreover, as noted previously, the facts relating to Storer Cable's actions in securing the exclusive contracts support the allegations regarding its intent.

Second, the counterclaim's factual allegations indicate that Storer Cable has a dangerous probability of success in achieving and preserving its monopoly over the retail cable sales market in the Montgomery area. According to Montgomery Cablevision, Storer Cable already has a tremendous share of the retail cable sales market in the Montgomery area. Moreover, the injuries alleged to the competition in the market of cable television services as a result of the exclusive contracts indicate that Storer Cable will likely succeed in its attempt to monopolize the retail cable sales market in the Montgomery

area. If it is true that consumers in the Montgomery area widely demand the Turner Network program service and ESPN's football package and that there is no comparable alternative programming, then it is plausible to infer that the exclusive contracts will hinder the ability of any other cable television company to compete effectively with Storer Cable in the retail cable sales market. The court thus finds that Montgomery Cablevision has sufficiently stated a claim for relief against Storer Cable for attempting to monopolize the retail cable sales market in the Montgomery area in violation of § 2 of the Sherman Act.

### C. Conspiracy to Monopolize

 The offense of conspiracy to monopolize under § 2 of the Sherman Act requires: "(1) concerted action deliberately entered into with the specific intent of achieving a monopoly; and (2) the commission of at least one overt act in furtherance of the conspiracy." *Seagood Trading Corp. v. Jerrico, Inc.,* 924 F.2d 1555, 1576 (11th Cir. 1991). Thus, a § 1 Sherman Act claim and a § 2 conspiracy to monopolize claim require the same threshold showing—the existence of an agreement to restrain trade. Once this showing is made, then it must be established that the conspiracy was formed with the specific intent to obtain or maintain a monopoly. *Id. See also Todorov v. DCH Healthcare Auth.,* 921 F.2d 1438, 1460 n. 35 (11th Cir.1991).

Montgomery Cablevision maintains that its claim for conspiracy to monopolize is based on Storer Cable's monopolization or attempted monopolization of the retail cable television sales market in the Montgomery area and the assistance of the other counterclaim defendants in Storer Cable's efforts to attain or preserve this monopoly. According to Montgomery Cablevision, the conspiracy centers on the exclusive contracts entered into among the counterclaim defendants. The counterclaim defendants, however, contend that it is implausible to infer that the counterclaim defendants in this case who are cable program suppliers and distributors— that is, Tele–Communications, Satellite Services, the Turner Companies, and ESPN— would conspire with Storer Cable to assist it

in its efforts to monopolize the retail cable sales market. They maintain that there is no rational economic motive for them to enter such an alleged conspiracy and that Montgomery Cablevision has thus failed to provide an inference of specific intent to conspire to achieve the stated goal of the conspiracy. For the reasons that follow, the court finds that Montgomery Cablevision has alleged sufficient facts to support its claim of conspiracy to monopolize based on Storer Cable's monopolization or attempted monopolization of the retail cable sales market in the Montgomery area and the assistance of the other counterclaim defendants in this effort.

■ First, for the reasons discussed previously with regard to the § 1 Sherman Act claim, the court finds that Montgomery Cablevision has sufficiently alleged the existence of an agreement to restrain trade. In this case, the conspiracy to monopolize centers on the exclusive contracts between Storer Cable and Turner Network and between Storer Cable and ESPN. Second, in support of its claim that the exclusive contracts are part of a conspiracy to monopolize the retail cable sales market, Montgomery Cablevision specifically alleges that the cable television program suppliers and distributors who are counterclaim defendants in this case "have sufficient market power over the ... programming at issue in this suit to aid Storer Cable in its efforts to monopolize" the retail cable sales market. Moreover, as discussed previously, these allegations of market power are supported by claims regarding the high desirability of the programming offered by Turner Network and ESPN and the lack of comparable alternative programming.[33] From these allegations, it is possible to infer

that the cable television program suppliers and distributors involved in this case are in a position to help Storer Cable monopolize the retail cable sales market.

■ Third, the counterclaim alleges that Tele–Communications, Satellite Services, and the Turner companies "knew or should have known" that the exclusive contract for the Turner Network program service would be used for monopolistic reasons. To support this conclusion, the counterclaim states that Tele–Communications, Satellite Services, the Turner companies, and Storer Cable are "vertically integrated or otherwise financially or managerially related or affiliated corporations." In other words, Montgomery Cablevision suggests that because of their corporate relationship with Storer Cable, Tele–Communications, Satellite Services, and the Turner companies should have been aware of Storer Cable's intent regarding the exclusive contract. Similarly, the counterclaim alleges that ESPN "knew or should have known" that the exclusive contract for ESPN's NFL football package would be used by Storer Cable for monopolistic purposes. In support of this claim, the counterclaim specifically states that ESPN "promoted its exclusive contracts as 'overbuild protection.'" That is, ESPN marketed its exclusive contract as a means through which an incumbent cable franchise could protect itself against overbuilders and thereby monopolize the market for retail cable sales. Sufficient facts, therefore, have been alleged to support the claims that the counterclaim defendants charged with aiding Storer Cable in its attempt to monopolize knew or should have been aware of Storer Cable's intent to monopolize.[34]

33. *Contrast with Futurevision,* 789 F.Supp. at 777 *and Northeastern Educ. Television of Ohio, Inc. v. Educ. Television Ass'n,* 758 F.Supp. 1568, 1579 (N.D.Ohio 1990), where claims of conspiracy to monopolize were dismissed because of the failure to allege that the defendants possessed sufficient market power to assist in establishing a monopoly in the relevant market.

34. *Contrast with Syufy Enter. v. Am. Multicinema, Inc.,* 793 F.2d 990, 1000–1001 (9th Cir. 1986), *cert. denied,* 479 U.S. 1031, 107 S.Ct. 876, 93 L.Ed.2d 830 (1987); *and Futurevision,* 789 F.Supp. at 777–78. In *Syufy,* the court of appeals found there was no conspiracy to monopo-

lize where there was no evidence indicating that certain film distributors, who were alleged co-conspirators, knew or should have known that their licensee intended to exploit its exclusive film licensing rights for its own monopolistic purposes. Similarly, in *Futurevision,* the district court dismissed a claim for conspiracy to monopolize where there were no allegations that cable television programmers knew or should have known that certain cable television operators were using their exclusive rights to monopolize the cable services markets nor any facts to support such an inference. In this case, in contrast, there are specific allegations concerning the knowledge of the counterclaim defendants re-

■ Finally, the court finds that the counterclaim contains sufficient facts to support an inference that the counterclaim defendants were intentional parties to the alleged conspiracy to monopolize. Admittedly, although the counterclaim makes specific allegations regarding the intent of Storer Cable to monopolize the market for retail cable television sales, it does not explicitly allege that the other counterclaim defendants entered the conspiracy with the intent to monopolize. However, the counterclaim provides a sufficient basis to infer that the other counterclaim defendants intentionally aided Storer Cable in its attempt to monopolize the retail cable sales market. For example, the alleged vertical integration of Tele–Communications, Satellite Services, the Turner companies, and Storer Cable indicates that these counterclaim defendants had a financial interest in assisting Storer Cable's attempt to monopolize. ESPN's marketing technique with regard to the exclusive contracts also points to an intent to aid Storer Cable in its monopoly effort. Furthermore, the counterclaim specifically alleges that the cable program suppliers and distributors had "[n]o valid business reason" for their refusal to deal with Montgomery Cablevision other than the attempt to monopolize.[35] Finally, contrary to the contentions of the counterclaim defendants, it is plausible that the counterclaim defendants had a rational motive to enter the alleged conspiracy, which would provide an inference of specific intent to conspire. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 595, 106 S.Ct. 1348, 1360, 89 L.Ed.2d 538 (1986) (discussing need to establish motive to enter conspiracy in antitrust cases).

The counterclaim defendants contend that the program suppliers and distributors have no rational economic motive to conspire with Storer Cable to monopolize the cable television services market in the Montgomery area because such a conspiracy would be against their interests. They maintain that the creation of a monopoly at the level of retail cable sales would enable Storer Cable, the cable system operator, to drive down the price that it pays to the programmers for their programming. Thus, according to the counterclaim defendants, the cable programmers and distributors have every incentive not to engage in a conspiracy to monopolize. This is essentially the same position as taken by the court in *Futurevision*, 789 F.Supp. at 779. There, the district court held that it would be contrary to the program suppliers' interest to aid cable system operators in achieving monopoly power. Moreover, the court was persuaded that the cable program suppliers had no rational economic motive to conspire against their own interests.[36]

Where there is significant intrabrand competition, the counterclaim defendants and the court in *Futurevision* may be correct that it would be against the interests of the cable program suppliers to assist a cable television operator in achieving a monopoly in the cable television services market. However, they both overlook the situation where a local cable operator already possesses significant market power in the retail cable sales market and is in the position to coerce the program suppliers into exclusive dealing arrangements. As discussed above in the context of the § 1 Sherman Act claim, it is possible that Storer Cable and Tele–Communications, as dominant dealers in the market of cable tele-

garding Storer Cable's intentions to monopolize the retail cable sales market in Montgomery and facts to support these contentions.

35. *Contrast with Futurevision*, 789 F.Supp. at 778, where complaint failed to allege that there were no valid business reasons for cable programmers to refuse to supply programming to a new cable franchise.

36. The counterclaim defendants also point to *TV Communications Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022 (10th Cir.1992), to support their contention that the program suppliers and distributors in this case had no

rational economic motive to aid Storer Cable in its efforts to achieve a monopoly over the retail cable sales market. However, that case is inapposite. There, the court was faced with allegations that cable television operators had conspired with program suppliers *to aid the program suppliers* in maintaining their monopolies over the cable programming market. The court concluded that the cable operators would have no rational motive to create such an environment. In this case, in contrast, Montgomery Cablevision has alleged that the program suppliers conspired with a cable television operator, Storer Cable, *to aid the cable operator* in its efforts to monopolize the retail cable sales market.

vision services, had sufficient power to coerce the Turner companies and ESPN into offering them exclusive contracts for their programming. Thus, in this case, there may well be plausible reasons why the cable programmers and distributors would conspire with Storer Cable. Furthermore, contrary to the assertion that a monopoly at the retail cable sales level would necessarily enable Storer Cable to drive down the price paid for programming, in some instances, intrabrand restrictions enable a supplier to keep prices to dealers higher than would otherwise be possible. *See* Peter M. Gerhart, *The "Competitive Advantages" Explanation for Intrabrand Restraints: An Antitrust Analysis,* 1981 Duke L.J. 417, 447–448 (1981). For example, where there is active intrabrand competition, a dealer's profitability on a particular brand decreases and the supplier or manufacturer can be forced to lower his wholesale price to compensate for his brand's lower profitability in the retail market. However, without active intrabrand competition, the supplier can maintain higher wholesale prices, and hence, retain more profits for itself. *Id.; see also* 8 Areeda, *Antitrust Law* § 1603 at 34. Finally, the allegations regarding the vertical integration of the Turner companies and Storer Cable indicate that to some extent the economic interests of the programmers in this case coincide with those of the cable operator.

■ It is also important to emphasize that, to prevail on a motion to dismiss, it is not enough for a defendant to articulate *any* economic motive—or absence thereof—in support of its behavior, regardless of its accuracy in reflecting what actually happened. *Cf. Eastman Kodak,* —— U.S. at ——, 112 S.Ct. at 2083 ("The Court did not hold that if the moving party enunciates *any* economic theory supporting its behavior, regardless of its accuracy in reflecting the actual market, it is entitled to summary judgment") (emphasis

in original). A claimant who posits a reasonable motive, even if there are other reasonable but contrary motives, should be allowed to survive a motion to dismiss and produce evidence of the true motive.

In sum, the court concludes that Montgomery Cablevision's counterclaim sufficiently states a claim for conspiracy to monopolize.[37]

## V. STATE ANTITRUST CLAIMS

Montgomery Cablevision also charges that the exclusive contracts among the counterclaim defendants have resulted in the creation and operation of an unlawful monopoly in violation of 1975 Ala.Code § 6–5–60 (1975).[38] It further alleges that the counterclaim defendants have monopolized or attempted to monopolize "both cable programming and the market for cable television services in Montgomery" in violation of state common law prohibiting monopolies.

■ Alabama's antitrust laws, both statutory and common law, are analytically identical to federal antitrust laws and are interpreted by Alabama courts in accordance with federal law. *Ex parte Rice,* 259 Ala. 570, 67 So.2d 825, 829 (1953) (per curiam) ("The federal statutes ... prescribe the terms of unlawful monopolies and restraints of trade as they should also be administered in Alabama"). *See also Avery Freight Lines, Inc. v. Alabama Pub. Serv. Comm'n,* 267 Ala. 646, 104 So.2d 705, 709 (1958) ("In construing the terms and provisions of Alabama statutes derived from federal statutes, such terms and provisions will usually be considered as having the meaning given by the federal courts"). For the reasons given above regarding the claims for relief under §§ 1 & 2 of the Sherman Act, the court thus concludes that Montgomery Cablevision has sufficiently stated claims for relief under 1975 Ala.Code § 6–5–60 and Alabama state common law

---

37. Because the court finds that Montgomery Cablevision has adequately stated a cause of action under § 2 of the Sherman Act, the court need not address whether the "essential facilities" doctrine also provides a basis for a § 2 claim in this case. *See, e.g., McKenzie v. Mercy Hosp.,* 854 F.2d 365, 369 (10th Cir.1988).

38. Section 6–5–60 provides in pertinent part:

"Any person, firm or corporation injured or damaged by an unlawful trust, combine or monopoly, or its effect, direct or indirect, may, in each instance of such injury or damage, recover the sum of $500.00 and all actual damages from any person, firm or corporation creating, operating, aiding or abetting such trust, combine or monopoly."

prohibiting monopolies, to the extent that the claims under state law parallel the claims under federal law.[39]

## VI. ORDINANCE 48–90

■ Montgomery Cablevision charges the counterclaim defendants with restraining or attempting to restrain trade, or monopolizing or attempting to monopolize the production, control, or sale of program material or program services used in the provision of cable television service in violation of § 3 of the City of Montgomery, Ordinance 48–90.[40] The counterclaim also alleges that the counterclaim defendants have contracted or combined to refuse to provide program material or program services used in the provision of cable service, with the purpose or effect of creating a monopoly or injuring competition in the provision of cable television service in Montgomery, in violation of § 4 of Ordinance 48–90.[41]

In an order entered earlier in this litigation, this court noted that the language and structure of Ordinance 48–90 appears to be modeled on federal antitrust laws. *See Storer Cable Communications, Inc. v. City of Montgomery,* 806 F.Supp. 1518, 1537 (M.D.Ala.1992) (Thompson, J.). Moreover, the court assumed that the city, by borrowing language and phrases from federal antitrust laws, meant also to import the accumulated case law interpreting that language. *Id.* at 1538. Because the court finds that Montgomery Cablevision has adequately stated claims for relief under §§ 1 & 2 of the Sherman Act, the court thus concludes that it has also stated claims for relief under Ordinance 48–90.[42]

## VII. INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONS

Montgomery Cablevision also charges the counterclaim defendants with the state-law tort of intentional interference with business relations. It contends that it has "initiated or commenced business relationships both with individuals who have subscribed or wish to subscribe" to Montgomery Cablevision's services, and that the exclusive dealing arrangements among the counterclaim defendants were "intended to disrupt and did disrupt these relationships." The counterclaim defendants maintain that Montgomery Cablevision has failed to state a claim for intentional interference with business relations, particularly with regard to potential sub-

---

**39.** Montgomery Cablevision alleges that the counterclaim defendants have monopolized or attempted to monopolize the *cable programming market* in violation of state common law, in addition to monopolizing the cable television services market. However, monopolization of the cable programming market is not alleged in the § 2 Sherman Act claim against the counterclaim defendants. Nor has Montgomery Cablevision presented any facts to support such a claim. The court thus concludes that although Montgomery Cablevision has sufficiently alleged a claim to monopolize or attempt to monopolize the cable television services market, it has not stated a claim to monopolize or attempt to monopolize the cable programming market.

**40.** Section 3 of Ordinance 48–90 provides:

"It shall be unlawful for a cable television exhibitor providing or intending to provide cable service within the City to restrain, or attempt to restrain the freedom of trade or production, or to monopolize, or attempt to monopolize the production, control or sale of program material or program services used in the provision of cable television service within the City.

"It shall be unlawful for a cable television distributor or cable television program suppli-

er to restrain, or attempt to restrain the freedom of trade or production, or to monopolize, or attempt to monopolize the production, control or sale of program material or program services used in the provision of cable television service within the City."

**41.** Section 4 of Ordinance 48–90 provides in pertinent part:

"It shall be unlawful for a cable television exhibitor providing or intending to provide cable television service within the City to contract or combine with any other person to fix or limit the lease, license, sale or exchange ... of program material or program services used in the provision of cable television service where the purpose or effect of such contract [or] combination is or may be to tend to create a monopoly or to injure, destroy, inhibit, prevent or lessen substantially competition with respect to the provision of cable television service within the City."

**42.** Because the court finds that Montgomery Cablevision has stated claims under §§ 1 & 2 of the Sherman Act, the court need not reach the question whether a particular set of facts could give rise to a valid cause of action under Ordinance 48–90 but not fall under the federal antitrust laws.

scribers of Montgomery Cablevision's services.

■ The elements of a cause of action for intentional interference with business relations under Alabama law are: (1) the existence of a contract or business relation; (2) the defendant's knowledge of the contract or business relation; (3) intentional interference by the defendant with the contract or business relation; and (4) damage to the plaintiff as a result of the defendant's interference. *Utah Foam Prod. Inc. v. Polytec, Inc.*, 584 So.2d 1345, 1353 (Ala.1991); *Gross v. Lowder Realty Better Homes & Gardens*, 494 So.2d 590, 597 (Ala.1986). Justification for the interference is an affirmative defense that has to be pleaded and proved by the defendant. *Utah Foam Prod.*, 584 So.2d at 1353; *Century 21 Academy Realty, Inc. v. Breland*, 571 So.2d 296, 297–98 (Ala.1990).[43]

■ For the following reasons, the court finds that Montgomery Cablevision has stated a claim of intentional interference with business relations with regard to those individuals who have subscribed to its services. First, the relationships between Montgomery Cablevision and its subscribers qualify as business relations protected under the tort of intentional interference in Alabama. *See Gross v. Lowder*, 494 So.2d at 597 (tort covers interference with business relations non necessarily involving a contract). Second, as the counterclaim states, Montgomery Cablevision is in direct competition with Storer Cable; therefore, it is reasonable to infer that the counterclaim defendants were aware of Montgomery Cablevision's business relations with its subscribers. Third, the factual allegations of the counterclaim support the contention that the counterclaim defendants interfered with these relations by entering into exclusive contracts that were intended to deprive Montgomery Cablevision of pro-

gramming that is in high demand by its subscribers. And finally, the allegations of the counterclaim, if true, indicate that Montgomery Cablevision has suffered damage as a result of this interference—that is, it has lost subscribers because of its inability to provide the programming at issue in this case. Of course, the justification for the interference is an affirmative defense that has to be pleaded and proved by the counterclaim defendants.

■ Moreover, the court finds that Montgomery Cablevision has alleged sufficient facts to state a claim for punitive damages in relation to the intentional interference with its subscribers. As the Alabama Supreme Court explained in *Gross v. Lowder Realty*, 494 So.2d 590 (Ala.1986), because interference with business relations is an intentional tort, punitive damages may be awarded if the act of interference was carried out wantonly, or spitefully, or maliciously. *Id.* at 597 n. 4. *See also Sparks v. McCrary*, 156 Ala. 382, 47 So. 332, 334 (1908). As noted previously, the counterclaim states that by entering into the exclusive contracts at issue in this case, the counterclaim defendants "began a course of conduct which was intended to disrupt and did disrupt" Montgomery Cablevision's business relations with its subscribers and that this conduct was "intentional, unfair and improper." Moreover, it is plausible to infer from the factual allegations of the counterclaim that the conduct of the counterclaim defendants was committed with the intent to injure the property of Montgomery Cablevision. *See* 1975 Ala.Code § 6–11–20(b)(2) (1975 & Supp.1992) ("malice" required for punitive damages defined as "[t]he intentional doing of a wrongful act without just cause or excuse ... With an intent to injure the person or property of another person or entity"). As discussed above, there is support for the contention

43. In the past, the Alabama Supreme Court has listed absence of justification for the defendant's interference as one of the elements of the plaintiff's cause of action. *See, e.g., Caine v. Am. Life Assurance Corp.*, 554 So.2d 962, 964 (Ala.1989); *Lowder Realty, Inc. v. Odom*, 495 So.2d 23, 25 (Ala.1986); *Gross v. Lowder Realty*, 494 So.2d at 597. However, in *Century 21 Academy Realty, Inc. v. Breland*, 571 So.2d 296 (Ala.1990), the court recognized that it was illogical to continue to list absence of justification as one of the elements of the plaintiff's cause of action and then to place the burden on the defendant to disprove it. The court, therefore, eliminated absence of justification from the elements and held that justification is an affirmative defense that must be pleaded and proved by the defendant. *Id.* at 297–98. *See also Underwood v. S. Cent. Bell Tel. Co.*, 590 So.2d 170, 176 n. 4 (Ala.1991).

that Storer Cable entered into the contracts with the intent to inhibit competition and to protect itself against overbuilders, such as Montgomery Cablevision, and that the other counterclaim defendants assisted Storer Cable in its efforts to monopolize the cable television services market in the Montgomery area.

■■■ The court, however, declines to decide at this time whether Montgomery Cablevision has stated a claim of intentional interference with business relations in relation to its potential subscribers. This claim presents novel and close issues of first impression under state law, which the Alabama Supreme Court has not yet resolved. Although the tort of intentional interference under Alabama law covers relationships not necessarily evidenced by an enforceable contract—that is, business relations among parties that are not founded in a contract—it is not clear whether an action may be maintained for interference with business relations which are prospective or potential, in other words, expected business relations. In developing the tort of intentional interference with contractual and business relations, the Alabama Supreme Court relied on 45 Am.Jur.2d, *Interference* §§ 49–50 (1969) and James O. Pearson, Jr., Annotation, *Liability for Interference with At Will Business Relationship*, 5 A.L.R. 4th 9 (1981), both of which explicitly recognize a cause of action for interference with existing *and* prospective business relations. *See Gross v. Lowder Realty Better Homes Gardens*, 494 So.2d 590, 597 (Ala.1986).[44] However, in establishing the elements of the tort of intentional interference with business or contractual relations, the Alabama Supreme Court required that the plaintiff prove "the *existence* of a contract or business relation." *Gross v. Lowder Realty*, 494 So.2d at 597 (emphasis added). Moreover, it did not incorporate into its definition of the tort the language regarding "prospective" or "potential" or "expectant" business relations that is found in 45 Am.Jur. 2d, *Interference* §§ 49–50 and Annotation, 5 A.L.R. 4th 9. This absence may indicate

that the Alabama Supreme Court intended to define the tort as narrowly as possible and to exclude from its definition a cause of action for interference with potential business relations. On the other hand, it may be that the court did not want to address this issue at that time and that such an action is not entirely precluded. As the court stated, "We have set forth above what we consider to be the broad framework of the cause of action, but defer to future cases a determination of the more detailed questions that undoubtedly will be raised as the cause of action moves from its formative stages and develops into a solidified body of law." *Gross v. Lowder Realty*, 494 So.2d at 597.

Unfortunately, subsequent cases have shed little light on the scope of the tort and the type of "business relations" that are covered. They also provide little indication as to whether the Alabama Supreme Court would recognize an action for interference with prospective business relations. The most extensive recent discussion of the tort is found in *Utah Foam Products, Inc. v. Polytec, Inc.*, 584 So.2d 1345 (Ala.1991). There, the Alabama Supreme Court provided some insight into the reasons underlying the tort of interference with a business relation. The Court stated that it is "designed to protect property interests in business and to compensate for the damage caused by that interference," and that "it is the right to do business in a fair setting that is protected." *Id.* at 1353. Based on these principles, the Court held that it was not necessary for a plaintiff to prove that it would have received a particular contract but for the tortious interference with business relations. It is unclear, however, whether this holding indicates that the Court includes prospective business advantage or relations within the tort of intentional interference. In *Utah Foam*, there was substantial contact between the plaintiff and the prospective client in an attempt to attain a contract. Thus, the Court may have considered this contact as establishing the existence of a business relation between the parties. Unfortunately, however, the Court did

---

**44.** The Restatement (Second) of Torts also recognizes an action for interference with prospective business relations. *See* § 766B & cmt. c (1979).

not discuss or elaborate on this aspect of the tort.

Because Montgomery Cablevision's claim of intentional interference with potential subscribers is a minor one and will not entail additional discovery, the court believes that the issues raised should be resolved later in this litigation. Indeed, it is possible that after further factual development, the court will not have to reach the difficult issues raised by the claim. At this time, it is difficult to characterize the exact nature of the relations between Montgomery Cablevision and its potential subscribers. The counterclaim does not indicate the nature and extent of Montgomery Cablevision's contact with potential subscribers. Further factual development, however, may reveal that there was substantial and significant contact between Montgomery Cablevision and its potential subscribers—for example, through advertising or phone calls or inquiries on the part of potential subscribers. Therefore, it is possible that Montgomery Cablevision established business relations with its potential subscribers that are protected by the tort of intentional interference. It may also be that the claim is resolved on other than Rule 12(b)(6) grounds. For these reasons, the court declines to decide at this time whether Montgomery Cablevision has stated a claim for intentional interference with business relations with regard to its potential subscribers.

Accordingly, for the reasons discussed above, it is the ORDER, JUDGMENT, and DECREE of the court that the motions to dismiss filed by the counterclaim defendants on January 27 and February 5, 1993, are denied.